RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

            *v.*

MARVIN CHARLES GABRION, II,
                    *Defendant-Appellant.*

Nos. 02-1386/1461/1570

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00076—Robert Holmes Bell, District Judge.

Argued: October 13, 2010

Decided and Filed:  August 3, 2011

Before:  BATCHELDER, Chief Judge; MERRITT and MOORE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Margaret O'Donnell, Frankfort, Kentucky, for Appellant.  Timothy P. VerHey, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:** Margaret O'Donnell, Frankfort, Kentucky, Kevin M. McNally, McNALLY & O'DONNELL, Frankfort, Kentucky, Judy Clarke, CLARKE & RICE, San Diego, California, for Appellant.  Timothy P. VerHey, Joan E. Meyer, ASSISTANT UNITED STATES ATTORNEYS, Grand Rapids, Michigan, for Appellee.

        MERRITT, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, C. J. (pp. 58-74), delivered a separate opinion concurring in part and dissenting in part.

1

———————————

**OPINION**

———————————

MERRITT, Circuit Judge.  We first heard this case and rendered a 2-1decision on March 14, 2008, concluding that murder in a National Forest falls within federal subject matter jurisdiction, *United States v. Gabrion*, 517 F.3d 839 (2008).  The parties then filed supplemental briefs in December 2009 and February 2010; and, after a second oral argument, we are now prepared to decide the other issues on the merits.

This case is a direct appeal pursuant to 18 U.S.C. § 3595 in a federal death penalty murder case tried in federal court in Grand Rapids, Michigan, for a murder committed in the Manistee National Forest.  The defendant, Marvin Gabrion, was sentenced to death by the jury.  Although the defendant raises issues on appeal relating to the guilt and sentencing phases of the trial, we find that three issues, all arising in connection with the sentencing phase, are the most difficult.  The first arises from the need to determine the nature of Gabrion's severe mental and emotional disabilities in order to determine his competence to stand trial at the sentencing phase of the case after he had physically attacked his lawyer in open court in front of the jury.  The second arises from the ruling of the District Court that Gabrion, in an effort to mitigate his punishment to life imprisonment, could not use the fact that Michigan, where the murder occurred, had abolished the death penalty.  His counsel wanted to offer in mitigation and argue to the jury that in our legal system Gabrion's trial would have had to take place in state court where life imprisonment was the maximum punishment, instead of in the federal court, if the victim's body had been found outside the Manistee National Forest, just 227 feet away from where it was found inside the National Forest.  His counsel wanted the jury to choose life imprisonment, rather than the death penalty, because the State of Michigan had abolished the death penalty and had not executed anyone for more than 160 years.  The third issue arises from the failure of the District Court to advise the jury that it must find that the "aggravators outweigh the mitigators beyond a reasonable doubt" in order to impose the death penalty.  The District Court left undefined the

measure of persuasion or the degree of certitude required of each juror concerning the ultimate question of fact resolved by the weighing process.

The State of Michigan accused Marvin Gabrion of raping Rachel Timmerman in August 1996. There is no doubt that he murdered her and her infant daughter in June 1997 while awaiting trial for raping her. The jury verdict at the guilt phase of Gabrion's murder trial accepted the government's detailed evidence that Gabrion bound Rachel Timmerman with chains during the first week of June 1997, took her while alive in a small boat, and dumped her into Oxford Lake with cinder blocks to weigh her down. Her bloated, drowned body was found on July 5, 1997, after it had been in the lake for several weeks. The lake was a shallow swamp filled with vegetation so that the body would stay where it was dumped from the boat and would not be carried to another location by a current or wind. The body was within the Manistee National Forest, 227 feet south of the boundary. Timmerman's eyes and mouth were covered with duct tape wrapped around her head. In addition to overwhelming circumstantial evidence, three witnesses testified that Gabrion had made statements to them incriminating himself in Timmerman's murder.

At the sentencing phase of the case after the guilty verdict, the jury found the existence of a number of aggravating factors: a likelihood that Gabrion would harm others in the future; the brutal, depraved, and premeditated nature of his crime; the murder of Timmerman's infant daughter; and obstruction of justice in order to avoid apprehension for rape. The jurors also found as mitigating factors that he was abused as a child and that he had a significant Antisocial Personality Disorder.

The testimony and the psychiatric literature lead to a conclusion that Gabrion suffered from an extreme Antisocial Personality Disorder in the nature of severe psychopathic madness; but we agree with the District Court that this did not render him incompetent to stand trial. He knew what he was doing throughout. We conclude, however, that the District Court did err in two respects — by failing to give a proper reasonable doubt instruction and by refusing to allow Gabrion's counsel to argue for mercy in mitigation of the death penalty on the ground that Gabrion could not have

received the death penalty if the body had been found 227 feet away, outside the National Forest. Counsel was prevented from trying to convince the jury in mitigation that the administration of the death penalty in this instance was random and based on chance. The District Court's ruling in this respect was in error under 18 U.S.C. § 3592(a), which reads: "Mitigating factors — In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider *any mitigating factor . . . .*" (Emphasis added.) We will first analyze the competence, mitigation, and reasonable doubt problems. We will then analyze the remaining issues. The result is that the case will be remanded for a retrial of the sentencing phase of the case. The issues will be discussed in the order set out in the footnote below.[1] The statute provides that on appeal: "The Court of Appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death . . . ." 18 U.S.C. § 3595(c)(1).

---

[1] I.      Gabrion's Mental Disabilities and His Competence to Stand Trial
II.     Whether Michigan's Abolition of the Death Penalty Is a "Mitigating factor" That the Jury May Consider
III.    The Failure to Give a Reasonable Doubt Instruction in Weighing Aggravators and Mitigators
IV.     The Failure of the Indictment to Allege Statutory Aggravating Factors
V.      Proof of Subject Matter Jurisdiction
VI.     Gabrion's Request to Proceed Without Counsel
VII.    Whether Gabrion's Physical Assault of his Counsel in Court Required the Withdrawal of his Trial Counsel or a Mistrial
VIII.   Whether the In Camera Conferences between the District Judge and Gabrion's Defense Counsel Outside of Gabrion's Presence Violated Gabrion's Rights
IX.     The District Court's Decision Not to Disclose a Report Suggesting That a Government Witness May Have Been Biased Against Gabrion
X.      The Removal of a Juror Who Was Allegedly Sleeping
XI.     Admission of Videotaped Testimony of Coleman and Westcomb
XII.    Examination of Gabrion by Government Psychiatrist and Testimony in Rebuttal Concerning Gabrion's Mental Health Evidence as Mitigation
XIII.   Unresolved Ethics Complaint Filed Against Government Witness, Dr. Ryan
XIV.    The Death Qualification of the Jury
XV.     Constitutionality of the Act's Penalty Phase Evidentiary Standard
XVI.    Constitutionality of Other Acts Information Admitted During Penalty Phase Supporting "Future Dangerousness" as a Non-Statutory Aggravating Factor
XVII.   Propriety of Remarks by Prosecutor During Closing Argument
XVIII.  Testimony of Victim's Mother Requesting the Death Penalty
XIX.    Allegations of Jury Bias Based on Post-Trial Juror Comment to Newspaper
XX.     Alleged Brady Violation Concerning Competency Challenge to Government Witness
XXI.    Jury Instructions in the Penalty Phase

### I.  Gabrion's Mental Disabilities and His Competence to Stand Trial

The actual murder trial began on February 25, 2002, and ended on March 16, 2002.  Beginning with pretrial matters three years before and throughout the trial, Gabrion consistently disrupted the proceedings in many ways.  At oral argument before us on appeal, appellate counsel focused her argument primarily on the contention that Gabrion was incompetent to stand trial — particularly during the sentencing phase after he hit his lawyer in the face with his fist in front of the jury.  The claim that Gabrion lost competence in the sentencing phase of the trial when he punched his lawyer in the face is belied by the testimony of Dr. Gregory Saathoff.  He is a professor of clinical psychology at the University of Virginia.  He testified on March 15, 2002, after Gabrion's attack on his lawyer.  Saathoff testified in detail that Gabrion's behavior at trial was part of Gabrion's deviant personality characterized by a recurring pattern of deception and in this instance his effort to fake incompetence.[2]  This evaluation after the attack was consistent with the evaluations of seven other mental health experts before the attack.  For example, the first evaluation was given by Dr. Emily Fallis of the Federal Medical Center in Fort Worth in May 2000.  She found Gabrion to be a "sociopath," a man with an "Antisocial Personalty Disorder [that] include[d] inability to follow rules

---

[2]Dr. Saathoff illustrated this deception in the following testimony:

Q.  Now, did you also ask him what day it was and what year it was?
A.  Yes, I did.
Q.  And what month did he say it was?
A.  He stated that he thought it was February.
Q.  In fact it was March?
A.  Correct.
Q.  Did he tell you what year he thought it was?
A.  Yes, he did.
Q.  And what year did he tell you he thought it was?
A.  He stated that he thought it was the year 2003.
Q.  And in fact it was this year, 2002?
A.  That's true.
Q.  Did you have occasion to determine through your review of other materials Mr. Gabrion's ability when it suits his purpose to know exactly what time of day it is?
A.  Yes, sir.
Q.  How do you do that?
A.  I asked to review the recent records from the Kent County Jail to see if there were any writings of Mr. Gabrion, certain requests that he sent in to the medical department or to others asking for various things, which is common in these types of settings.  And in order to be processed, these need the name of the individual, the date, and of course the request.  And on each of them the correct year was given, 2002; the correct month, March; and what appeared to be the correct date.

and laws; lying and manipulating others; impulsivity; irritability and aggressiveness; and consistent irresponsibility." (Vol. VII, JA 2277.) Gabrion's behavior fits the checklist for severe psychopathy in the psychiatric literature that includes the following characteristics:

1.    Glibness / superficial charm
2.    Grandiose sense of self-worth
3.    Need for stimulation
4.    Pathological lying
5.    Conning/manipulative
6.    Lack of remorse or guilt
7.    Shallow affect
8.    Callous / lack of empathy
9.    Parasitic lifestyle
10.   Poor behavioral controls
11.   Promiscuous sexual behavior
12.   Lack of realistic, long-term goals
13.   Impulsivity
14.   Irresponsibility
15.   Criminal versatility

Kent A. Kiehl, "A Cognitive Neuroscience Perspective on Psychopathy: Evidence for Paralimbic System Dysfunction," *Elsevier* 107, 109 (2006), *available at* www.sciencedirect.com by searching for author.

From the early pretrial proceedings, Gabrion sought to represent himself without a lawyer. He began to inundate the magistrate judge with letters and writings saying that his lawyers were "Satanic" and trying to frame him. He refused to cooperate with his appointed lawyers by providing information. He harassed them. For example, he called the office of one of his lawyers more than 80 times on a single day while continuing to inundate court staff with letters and phone calls. He continues this process on appeal by sending voluminous writings and letters to this court. On occasion, he called the district judge an "evil Hitler" and said in court that the judge was having sex with a 14-year-old girl and had gotten a 13-year-old girl pregnant. He insulted the jury. He came to court dirty with black marks over his forehead and the letters "AZZA" on his forehead. On some occasions during the trial, Gabrion's conduct became so unruly that the court had to expel him from the courtroom and allow him to return restrained at the wrists and

legs. As a precaution, Gabrion had to sit between two marshals when he was allowed to return to the courtroom after striking his lawyer in the face. Typically he made observations to the courtroom audience like the following: "I am sorry to be forced to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion. And I'll be quiet because I am being forced to just as if I were in Nazi Germany." These are but a few examples of many instances of similar behavior during the course of the trial.

Gabrion's appellate counsel argues that the only solution to the problem of Gabrion's efforts to disrupt the proceedings from the beginning of the proceedings in 1999, including his attack on his lawyer in March 2002, to the present time is to order a new competency hearing. Counsel concludes that the District Court "committed reversible error and denied Gabrion due process by refusing to hold a competency hearing" during the sentencing phase of the case. We do not agree because the psychiatric and mental health records in the case convince us, as they did the District Court, that Gabrion knew what he was doing. He was "malingering" — defined in psychiatric literature as "the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives," as explained in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV). He was faking incompetence in order to disrupt the trial.[3]

---

[3]There is an extensive record consisting of evaluations, reports, and testimony of 9 mental health experts. Gabrion was first evaluated by Emily Fallis of the Federal Medical Center in Fort Worth in May 2000; by Dr. Cathy Frank, Director of Forensic Psychiatry at Henry Ford Hospital in Detroit in June 2001; and by Dr. Richard DeMier and others of the Federal Medical Center in Springfield, Missouri, during the months of September and October 2001. He was also evaluated by Dr. Thomas Ryan, a board certified clinical professor of psychiatric medicine at the University of Virginia on February 20-21, 2002; by Dr. Gregory Saathoff, a professor of clinical psychology at the University of Virginia, on March 8, 2002; by Martin Waalkes, a psychologist at Hope Network Rehabilitation Services, who testified on March 13, two days after the attack; by Dr. David Griesemer, Chairman of the Department of Neurology at the University of South Carolina in Charleston, who testified on March 14, 2002; by Dr. Newton Jackson, a forensic psychologist for the State of Michigan, who testified March 14, 2002; and by Dr. Douglas Scharre, a neurologist at the Ohio State Medical School, who testified on March 13, 2002.

Only one of the nine experts, Dr. Scharre, testified that Gabrion was not malingering, not consciously faking insanity in an effort to disrupt the proceedings. Dr. Scharre testified at the request of defense counsel, although he did not interview or meet Gabrion. The other defense expert, Dr. Jackson, testified that during his interviews Gabrion appeared to be "deliberately not telling the truth" and "intended to deceive" in order to create the "impression" of a completely unorganized mind.

Malingering, faking incompetence, trying to deceive the court, pathological lying and murder are signs of a mental illness that thankfully affects only a small part of the population; but it is not the same as the mental illness that gives rise to "incompetence to stand trial." Incompetence is described as a mental illness causing the defendant to be "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The District Court must order a competency hearing only when it has "reasonable cause" to believe the defendant is incompetent. *Id.* Given the outcome of all of Gabrion's previous evaluations and the persistent finding of his malingering, no such reasonable cause existed. The deliberate refusal of an actor to assist counsel in order to appear crazy — like playing the role of an idiot in a play — makes the actor incompetent on the stage but not in a real court of law. Gabrion retained his memory and sought to create the appearance of idiocy, imbecility, and loss of memory.

## II. Whether Michigan's Abolition of the Death Penalty Is a "Mitigating Factor" That the Jury May Consider

Very early in this case, the District Court thought that Michigan's policy against the death penalty was an important factor that should be taken into account by the Department of Justice. The court engaged government counsel in an extended discussion of the subject, only part of which is quoted below:

> MR. VERHEY: . . . They've [the capital punishment decision makers in the Justice Department] told us that they do not factor into their consideration the fact that a case might come from a state that does not recognize the death penalty as opposed to a state that does.

> THE COURT: Well, I'm not — I don't want to argue with you, but I want to pose this question. Shouldn't it make a difference? The people of the State of Michigan are ultimately sitting on the jury. The people of the State of Michigan are ultimately the ones of which this judge and the prosecution team and the defense team are comprised. Under a system of federalism, aren't the state's public policy considerations of some significance to the Department of Justice?

The point of view first described by the District Judge in this colloquy at the beginning of the case ("the people of Michigan are ultimately sitting on the jury") takes into

account that a large portion of the population is presumably somewhat skeptical about the death penalty. Michigan's abolition of the death penalty, adopted by the Michigan state legislature in 1846,[4] presumably reflects the will of the people, and the "jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 306 (2004). That is the reason the Sixth Amendment requires that the jury must be drawn from "the State and district wherein the crime shall have been committed." Constitutionally, the question of imposing the death penalty must be localized. It must be vested in a local jury so that the punishment will reflect the values of the people of Michigan in order "to maintain a link between contemporary community values and the penal system." *Gregg v. Georgia*, 428 U.S. 153, 181 (1976).

The District Court later ruled that Michigan's longstanding policy against the death penalty could not be mentioned or admitted as a mitigating factor, or discussed with the jury in final argument during the penalty phase of the trial. It could not be referred to as a reason for sparing Gabrion's life. Failing to consider the specific language of the statute allowing "any mitigating factor," the court reasoned without further discussion that the Michigan policy did not fit within any of eight mitigating factors listed in the Federal Death Penalty. This ruling is inconsistent with the language of the Act requiring the factfinder to consider "any mitigating factor" and "any information relevant to a mitigating factor." 18 U.S.C. § 3592(a); *id.* § 3593(c).

---

[4]In 1963, Michigan included its ban on the death penalty in its state constitution, becoming the only state to do so. *See* Mich. Const. art. IV, § 46; Eric A. Tirschwell & Theodore Hertzberg, *Politics and Prosecution: A Historical Perspective on Shifting Federal Standards for Pursuing the Death Penalty in Non-Death Penalty States*, 12 U. Pa. J. Const. L. 57, 70 (2009) (noting that "[o]f over sixty legislative attempts and four petition drives to revive capital punishment in Michigan, none has proven successful"); Eugene G. Wanger, *Historical Reflections on Michigan's Abolition of the Death Penalty*, 13 T.M. Cooley L. Rev. 755 (1996).

The Act provides as follows:

**§ 3592.  Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified**

(a) **Mitigating factors.** — In determining whether a sentence of death is to be imposed on a defendant, the finder of fact <u>shall consider any mitigating factor, including</u> the following:

(1) **Impaired capacity.** . . .
(2) **Duress.** . . .
(3) **Minor participation.** . . .
(4) **Equally culpable defendants.** . . .
(5) **No prior criminal record.** . . .
(6) **Disturbance.** . . .
(7) **Victim's consent.** . . .
(8) **Other factors.** — Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

*Id*. § 3592(a) (emphasis added).  Thus, the statute requires ("shall") consideration of "any mitigating factor, including" a non-exclusive list of eight factors.  The statute then sets out a large number of aggravators for different capital crimes.  It also has an open-ended aggravator provision similar to the "any mitigating factor" language.  *See id.* § 3592 ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.").  Like mitigators, the aggravator list is expandable, and as we shall point out in Section XV the government expanded the aggravators beyond those listed to include Gabrion's "future dangerousness."  Section 3593(c) provides more broad language regarding mitigating factors:  "[I]nformation may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factors . . . .  The defendant may present any information relevant to a mitigating factor . . . . [T]he defendant . . . shall be given fair opportunity to present argument . . . as to the appropriateness in the case of imposing a sentence of death."  Section 3593(d) then requires that "a finding with respect to any aggravating factor must be unanimous" but "a finding with respect to a mitigating factor may be made by 1 or more members of the jury."  Based on that rule, one juror could block the death penalty.

There are no cases so far that have ruled in a federal death case on the question of permitting evidence or argument concerning a given state jurisdiction's policy against the death penalty. There are a few cases, however, that discuss the meaning of the "any mitigating factor" language in the Act. *United States v. Davis*, 132 F. Supp. 2d 455, 464 (E.D. La. 2001), has been repeatedly cited both by other District Courts following this approach and by Gabrion in the instant matter. The proffered mitigating evidence in *Davis* was a "residual doubt" argument, defined by the court as "a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' " *Davis*, 132 F. Supp. 2d at 456. The court's opinion contained the following crucial paragraph:

> The most notable aspect of the statute is the introductory statement. The finder of fact (1) "shall" consider (2) "any mitigating factor, (3) including the following." First, the jury "shall" or *must* consider the mitigating factors; it is obligatory, not discretionary. Second, the fact finder must consider "any" mitigating factor. There is no qualification or limitation other than the factor "mitigate" against a sentence of death. Third, "[i]ncluding the following" means the subsequent list is not exclusive, but is instead illustrative. The eight identified factors are examples of specific factors that, if supported by the evidence, mitigate against the death penalty. Most significantly for the issue here, subhead (8) which refers to other factors "in the defendant's background, record, or character or any other circumstance of the offense" is a *sub* category of "any mitigating factor" rather than being the outer boundaries of what may be considered as mitigating. What 18 U.S.C.A. § 3592 allows is substantially broader than what the Supreme Court has declared to be the minimal requirements under the Constitution. According to the Supreme Court, the Eighth Amendment demands consideration only for those mitigating factors that concern the defendant's "character or record and any of the circumstances of the offense ..." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Under the statute, on the other hand, the Supreme Court's constitutional minimum is simply subhead (8) of a non-exclusive list. The statute demands the fact finder consider "any mitigating" factor . . . period.

*Id*. at 464.[5]

<hr>

[5]The language of *Davis* has been followed in at least three other death cases: In *United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004), the proffered mitigating argument was that "it would not be fair to sentence [the defendant] to death when others who were guilty of equally or more awful crimes had not been executed." *Id*. at 194. The court characterized this argument as a "proportionality"

The question is whether the fact of the location of the body so close to a line that forbids the death penalty allows counsel to try to convince one or more jurors that imposing the death penalty in these circumstances would treat life or death in a random and arbitrary way based on chance. The phrase "any mitigating factor" plainly includes information about Michigan's policy against the death penalty and an argument based on the absence of proportionality in punishment when life or death is made to turn on chance and the lives of other equally guilty psychopaths are spared. The case was not brought to serve a special national interest like treason or terrorism different from the normal state interest in punishing murder. The jury should be given the opportunity to consider whether one or more of them would choose a life sentence rather than the death penalty when the same jury considering the same defendant's proper punishment for the same crime but prosecuted in Michigan state court could not impose the death penalty.

These arguments are all "mitigating" because they could conceivably make a juror question "the appropriateness in the case of imposing a sentence of death." 18 U.S.C. § 3593(c). It is possible that their arguments would not be very appealing to jurors in this case, but that is not the question. The question is whether counsel should be foreclosed from even making them.

At the sentencing phase of a death case the question is not a semi-technical question like a sentencing enhancement issue under the U.S. Sentencing Guidelines. The death penalty is never a "mandatory minimum." In such a case each juror must call on individual judgment drawn from a lifetime of experience and learning and must decide whether to impose the death penalty or a life sentence. The broad, multi-dimensional question of the death penalty is also the reason the error in this case cannot be said to be

---

argument and, adverting to the expansive reading of § 3592(a)'s introductory paragraph from *Davis* described above, concluded that this evidence was not barred as a matter of law from introduction. *Id.* at 194-96. In *United States v. Bodkins*, No. CRIM.A.4:04CR70083, 2005 WL 1118158 (W.D. Va. May 11, 2005), the District Court allowed as mitigating factors (1) that the defendant, if he received a life sentence instead of death, would never be released (on the theory that this information would mitigate by "assuag[ing] the jury's fear of the defendants' future dangerousness") and (2) a residual doubt argument substantially similar to the one made in *Davis*, mentioned above. *Id.* at *8-9. In *United States v. Moonda*, No. 1:06 CR 395, 2007 WL 2071924 (N.D. Ohio July 13, 2007), a brief order citing *Sampson* and *Davis*, the court allowed as mitigating evidence the presentation of "information to the jury regarding future confinement conditions in the Bureau of Prisons," to rebut the "popular public perception that federal prisons are like country clubs." *Id.* at *1 (internal quotation marks omitted).

"harmless" under the doctrine of "harmless error." (18 U.S.C. § 3595(c) provides: "The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.") We have no way of knowing beyond a reasonable doubt what one or more jurors would have done after listening to a lawyer arguing for life by effectively using Michigan's longstanding policy to buttress the argument, even with respect to a murderer as vile as Gabrion. Accordingly, we reverse on this issue for a new penalty phase of the trial.

In response to our decision on this point, our dissenting colleague argues that our opinion is "an endorsement of jury nullification of federal law." Unless the death penalty is mandatory under federal law, which of course it is not, mitigation of capital punishment by finding that historic practices and cultural inclinations in the local area outweigh other aggravating factors in the case is not jury nullification. Jury nullification and jury deliberation which arrives at a verdict of life imprisonment, are not the same. The latter is based on Socratic debate and choice after considering more complete information. Normally, deliberation based on more complete information is considered preferable to less informed decision making. That is the reason for the statutory insistence on jury consideration of "any mitigating factor" and "any information relevant to a mitigating factor." Congress did not want death imposed without full consideration of the alternative. A juror would not "nullify" any provision of the federal statute if she voted against the death penalty because she learned that its imposition is only possible because of the total happenstance of where the victim's body was found, and would be inconsistent with other murder cases in Michigan since 1846. In *Gregg v. Georgia*, 428 U.S. 153, 205 (1976), the Supreme Court recognized that "past practice among juries faced with similar factual situations" is valuable information in the capital sentencing process. Our dissenting colleague appears to be the first judge to suggest that allowing a jury to consider such information is unlawful jury nullification because it may encourage the jury to consider life imprisonment.

In addition to our colleague's "jury nullification of federal law" argument, the dissent also argues that there is a difference of opinion among the circuits on the issue of whether historic practices in a state fall within the language "any mitigating factor" or "any information relevant to a mitigating factor." No circuit has held that such information is inadmissible in litigation. This circuit-split argument culminates in the dissent's argument that "the case most closely analogous to Gabrion's is *United States v. Higgs*, 353 F.3d 281, 289 (4th Cir. 2003)." The dissent's problem is that the *Higgs* case, like the others she cites, does not raise the same question we have here. In *Higgs* the Court is clear that the question before it was a constitutional one — what the Eighth Amendment requires concerning the admissibility of mitigating evidence:

> We review de novo Higgs's claim <u>that the district court violated the Eighth Amendment</u> by refusing to submit to the jury, as a mitigating circumstance, that Higgs would not have been eligible for the death penalty if the murders had occurred within the jurisdiction of the State of Maryland. Higgs sought to introduce expert testimony that under Maryland law, the death penalty may only be imposed on the "triggerman" in cases such as this and to argue that, because the murders took place in an area where Maryland had an easement over federal property, he could not have known that he was on federal land when he committed the murders.

We do not reach any constitutional claim here because the statute itself is clear, and no party claims that a constitutional argument should be decided first. We find no conflict with any other circuit on the issue before us under sections 3592(a) and 3593(c).

## III. The Failure to Give A Reasonable Doubt Instruction in Weighing Aggravators and Mitigators

Gabrion argues that the District Court's penalty phase jury instruction concerning the manner in which the jury was to weigh the aggravating and mitigating factors violated his due process rights. Specifically, he argues that the jury should have been instructed that in order to impose death they need to find "beyond a reasonable doubt" the element of the death sentence that the aggravating factors outweigh the mitigating factors. The District Court did not advise the jury that it should apply any particular measure of persuasion or degree of belief to this ultimate question of fact. This ultimate

question on which life imprisonment or capital punishment turns was left to the jury to answer intuitively.  We believe this was error because a much greater degree of certainty is required when the life of a person is at stake.  We, therefore, hold that a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionally required for all other findings of fact and mixed questions of law and fact.  On the general question, see the broad language of *United States v. Gaudin*, 515 U.S. 506, 510-12 (1995) (criminal convictions must "rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt," including issues of "materiality" and "mixed questions of law and fact").

Under the Federal Death Penalty Act, a death-eligible defendant "shall be sentenced to death if, after consideration of the factors set forth in section 3592 . . . it is determined that imposition of a sentence of death is justified."  18 U.S.C. § 3591.  This determination is committed to the jury, who is tasked with weighing aggravating and mitigating factors; though the Act styles this determination as a "recommendation," it is one that the judge is obliged to follow.  18 U.S.C. § 3594.  Section 3593(e) states as follows to the degree or intensity of belief required by the jury:

> [T]he jury . . . shall consider whether all the aggravating factor or factors found to exist *sufficiently* outweigh all the mitigating factor or factors found to exist *to justify a sentence of death*, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.  Based upon this consideration, the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

(Emphasis added.)  Thus the statute itself leaves up in the air the measure of persuasion and the jury's requisite degree of belief on the ultimate element of the offense concerning the comparison between aggravators and mitigators.  In the instant case, mere "sufficiency" in the mind of a juror is all that the instructions to the jury, which mirrored the provision quoted above, implied.  The instructions were based on the

premise that there was no need for the jury to have in mind any particular degree of certainty.

We disagree with this premise. The sentencing phase of the case is part of a criminal proceeding that may result in a verdict of death. As discussed above, the Act plainly requires as a necessary precondition to a capital defendant's receiving the sentence of death that the government prove and the jury find that aggravators outweigh the mitigators. Normally, in the run-of-the-mill criminal case, the government is charged with "pro[ving] beyond a reasonable doubt . . . every fact necessary to constitute the crime" with which a defendant is charged. *In re Winship*, 397 U.S. 358, 364 (1970). This requirement insures "the moral force of the criminal law." *Id.* It has been "adhered to by virtually all common-law jurisdictions." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). This should be particularly true in death cases. Professor Linda Carter has outlined the basic reasons for this requirement:

> As the Court stated in a case reaffirming the principle that all mitigating evidence must be considered, regardless whether the jurors were unanimous in finding a particular mitigating circumstance:
>> The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case.
> The nature of the decision itself, life or death, thus speaks forcefully for using a heightened standard of beyond a reasonable doubt.

*A Beyond a Reasonable Doubt Standard in Death Penalty Proceedings: A Neglected Element of Fairness*, 52 Ohio. L.J. 195, 220 (1991) (quoting *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988)). *See also* Note, "Variable Verbalistics, The Measure of Persuasion in Tennessee," 11 Vand. L. Rev. 1413 (1958) (jury instructions on measure of persuasion needed must be clear and understandable).

Likewise, a number of state supreme courts in death penalty cases have thoroughly analyzed the question of the measure of persuasion and concluded that the

"beyond a reasonable doubt" standard is necessary "to communicate to the jurors the degree of certainty that they must possess that any mitigating factors do not outweigh the proven statutory aggravating factors before arriving at the ultimate judgment that death is the appropriate penalty." *People v. Tenneson*, 788 P.2d 786, 792-94 (Col. 1990) (collecting cases).

Recent trends in federal constitutional law confirm our application of the basic rule of *Winship* to the weighing process. The Supreme Court in *Ring v. Arizona* applied the reasoning of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) — which first announced the recognition that facts increasing a maximum sentence must be proven to a jury beyond a reasonable doubt, regardless of whether a criminal statute purports to make those facts sentencing considerations rather than elements of an offense — to the penalty phase of a capital prosecution, and held that the Sixth Amendment requires that aggravating factors required for the imposition of a death sentence must be found by a jury, not a judge. 536 U.S. 584, 609 (2002). The Court in *Ring* did not have the issue of weighing before it, *id*. at 597, n.4, but we think its reasoning is helpful in resolving this issue. The Government attempts to limit *Ring's* import by arguing that the Act's requirement that the jury find the presence of aggravating factors beyond a reasonable doubt is enough to satisfy constitutional requirements. They insist that under the Act a defendant is "death eligible" once the jury finds the presence of aggravators, and thus that the outcome of the weighing process, rather than increasing that eligibility, simply fixes the punishment within the eligible range, and so it is freed from all constitutional requirement otherwise applicable to jury findings. This is an empty formalism of the sort the Supreme Court explicitly rejected in *Ring*. *See Ring*, 536 U.S. at 602 ("The dispositive question . . . is one not of form, but of effect.") (quoting *Apprendi*, 530 U.S. at 494). It is plain from the Act that, even after the jury finds the presence of aggravators beyond a reasonable doubt, more needs to be proven before the defendant may be sentenced to death: a defendant is not truly "eligible" for the death penalty — that is, that the death penalty cannot legally be imposed on him — unless and until the jury

makes the determination that the aggravators outweigh the mitigators.**6** He is no more "eligible" for the death penalty before that determination is made than he was when he was indicted; the range of penalties to which he is exposed does not include the death penalty until the jury makes that required factual finding of this element of the offense. "All facts essential to the imposition of the level of punishment that the defendant receives — whether the statute calls them elements of the offense, sentencing factors, or Mary Jane — must be found by the jury beyond a reasonable doubt." *Ring*, 536 U.S. at 610 (Scalia, J., joined by Thomas, J., concurring). That requirement surely applies to the jury's determination of whether the Government has proven a defendant worthy of society's ultimate punishment, in spite of features of his case that may militate in favor of a life sentence.

The refusal of some of our sister circuits in death cases to impose the ordinary measure of persuasion applicable to criminal cases on the weighing of aggravators and mitigators is based on their theory that this weighing does not resolve a question of fact, but is instead a "process" designed to arrive at a moral, as opposed to factual, judgment. *See United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007) (holding that "the requisite weighing constitutes a process, not a fact to be found" and that "[t]he outcome of the weighing process is not an objective truth that is susceptible to (further) proof by either party"); *United States v. Fields*, 483 F.3d 313, 346 (5th Cir. 2007) (holding that the jury's decision that the aggravating factors outweigh the mitigating factors is "not a finding of fact" but a "highly subjective, largely moral judgment") (internal quotation marks and citations omitted).**7** We depart from the reasoning of these cases at two related points. First, it has never been the case that the constitutional requirement of

---

**6**Indeed, the Act provides that, even where no mitigators are found to exist, the jury must still make the additional finding of "whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e).

**7**The Fifth Circuit's reasoning in *Fields* was adopted wholesale by the Tenth Circuit in *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008), a case concerning an unrelated defendant. In addition, other courts have reached analogous conclusions on this issue, but in cases where the issue has not been squarely presented as it is before us. *See United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007) (refusing a reasonable doubt instruction for weighing under the Act but applying plain error review); *United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005) (refusing to characterize weighing under the Act as the determination of a "fact" in the context of a Fifth Amendment indictment clause challenge).

proof beyond a reasonable doubt applies only when the jury is tasked with the determination of "objective truth[s] . . . susceptible to . . . proof" or "raw facts."  In *United States v. Gaudin*, 515 U.S. 506 (1995), the Supreme Court explicitly rejected the notion of the criminal jury as a "mere factfinder," and held that the requirement of proof beyond a reasonable doubt extends to its resolution of mixed questions of law and fact. *Id*. at 513-14.  As referred to above, the Court in *Gaudin* held that "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *Id*. at 514.  Surely that responsibility is all the more acute where the ultimate conclusion is not just guilt or innocence, but life or death.

Second, these courts misapprehend the nature of jury determinations when they consider the idea of a "process" to be at odds with the question of ultimate fact that the process resolves.  In both civil and criminal cases at common law, we have long had many standards that require the jury to weigh factors that lead to an ultimate conclusion that the law regards as an ultimate finding of fact, even when that "fact" may have legal or moral, as well as "objective," aspects.  These include:  questions of negligence (where the jury is invited to "weigh[] interests" in evaluating whether a defendant's conduct meets that of a "reasonable man," *see* Restatement (Second) of Torts § 283 & cmt. e (1965)), punitive damages (where the jury is invited to weigh factors such as the character and intent of the defendant's act, the extent of the harm, and the wealth of the defendant in making the basically moral determination of whether his conduct was "outrageous," *see id*. § 908), insanity (where the jury is asked whether a defendant could appreciate the moral wrongfulness of his conduct at the time of his alleged offense, *see* Model Penal Code § 4.01 (1962)), tortious interference with contract (where the jury is tasked with weighing factors such as the defendant's intent in determining whether an alleged interference is "improper," *see* Restatement (Second) of Torts § 766, 8c cmt. j (1979)), and many other mixed issues of law and fact in tort and criminal law.  That these various weighing determinations involve a process in which the jury weighs factors does not mean that they do not result in the finding of a fact.  These determinations require varying degrees of certitude, *i.e.*, burdens of proof, depending on the policy or

attitude of the law in balancing the culpability of the defendants versus the nature of the punishment. But our society has decided on only one degree of certitude appropriate in criminal cases: beyond a reasonable doubt. Weighing aggravators versus mitigators in death cases is just one of many — as well as the most drastic — of the "processes" that lead to an ultimate finding of fact.

Finally, the Act's harmless-error provision notwithstanding, the law is clear that a court's error in refusing to deliver a reasonable doubt instruction to a jury in a criminal case is a structural error not susceptible to harmless error analysis. *See Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (refusing to apply harmless error analysis where trial court erred in describing burden of proof in a criminal case, reasoning that "a misdescription of the burden of proof . . . vitiates *all* the jury's findings"). Accordingly, our determination that Gabrion was entitled to a reasonable doubt instruction as to the weighing of aggravating and mitigating factors requires the reversal of his death sentence.

## IV.  The Failure of the Indictment to Allege Statutory Aggravating Factors

Gabrion argues that his indictment was fatally deficient under the Fifth Amendment because it did not allege any of the statutory aggravating factors that were legally necessary to render him eligible for the death penalty.[8] But one year before the trial, the government advised Gabrion of all the aggravating factors it would prove in a notice that it would seek the death penalty. Assuming for the sake of argument that the Fifth Amendment requires indictments under the Federal Death Penalty Act to allege

---

[8]Gabrion also argues in passing that the indictment was constitutionally deficient because it did not allege any of the mens rea factors based on intentionality enumerated in § 3591(a)(2) of the Federal Death Penalty Act. Gabrion is correct that the indictment must include one of these mens rea factors because they are necessary under the Act to impose a sentence of death. *See* 18 U.S.C. § 3591(a)(2); *United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005) (en banc) (holding that the Fifth Amendment requires the indictment in prosecutions under the Act to include a mens rea factor). Gabrion is mistaken, however, that his indictment omitted a mens rea factor. Both the original and superceding indictment charged Gabrion of "willfully" killing Rachel Timmerman; this is equivalent to the Act's mens rea requirement that the defendant "intentionally kill[] the victim," 18 U.S.C. § 3591(a)(2)(A).

statutory aggravating factors,**9** we nonetheless find that error to be harmless here. "The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C. § 3595(c)(2)(C). Gabrion has not set out how he was harmed by the absence of statutory aggravating factors in the indictment. Nor does he tell us how stating the aggravating factors in the indictment is a per se requirement not subject to the Act's harmless-error provision.

To determine whether the absence was harmless error, we look to the two primary functions of the indictment: (1) to provide notice of the crime, allowing the defendant to prepare a defense; and (2) to bring the public through a grand jury into the charging decision. *See United States v. Robinson*, 367 F.3d 278, 287 (5th Cir. 2004) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1967), and *Stirone v. United States*, 361 U.S. 212, 218 (1967)). As to the first function, Gabrion had notice of the aggravating factors one year in advance of trial—more than sufficient time to prepare a defense. As to the second function, no rational grand jury could fail to find that the prosecution lacked probable cause on any of the aggravating factors, because the evidence of probable cause on those factors was strong. *See Robinson*, 367 F.3d at 298. Moreover, the fact that Gabrion's sentencing jury later unanimously found all of the aggravating factors is, "at a minimum, persuasive evidence of how a grand jury would find." *Id.* at 288–89. Any error was, therefore, harmless.

We can summarize the situation here no better than Blackstone, who said the following regarding why courts should not reverse otherwise-proper convictions simply because the prosecution proceeded by information rather than by indictment: "The same notice was given, the same process was issued, the same pleas were allowed, the same

---

**9**Neither the Supreme Court nor this circuit has addressed this precise question, but we note that each of our sister circuits that has confronted this issue has held, on reasoning that is substantially similar by each, that the Fifth Amendment *does* require the indictment to allege at least one statutory aggravating factor. *See, e.g.*, *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006); *United States v. Allen*, 406 F.3d 940, 943–44 (8th Cir. 2005) (en banc); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004); *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003); *United States v. Quinones*, 313 F.3d 49, 53 (2d Cir. 2002).

trial by jury was had, the same judgment was given by the same judges, as if the prosecution had originally been by indictment." 4 William Blackstone, Commentaries *305 (cited in *Hurtado v. California*, 110 U.S. 516, 538 (1884) (holding that the Indictment Clause of the Fifth Amendment is not incorporated against the states via the Due Process Clause)). The same, too, with Gabrion.

## V. Proof of Subject Matter Jurisdiction

First, Gabrion raises a federal subject matter jurisdiction argument based upon and combined with a factual argument that the evidence was insufficient to prove that Gabrion murdered Timmerman at a location at Oxford Lake owned by the federal government. He also raises a second argument that the "patchworked" character of federal ownership of parcels in the Manistee National Forest renders any murder conviction or finding of jurisdiction there a violation of due process, equal protection, and the Eighth Amendment. Judge Moore has addressed these same federal criminal jurisdiction arguments in her previous, separate opinion on subject matter jurisdiction in *United States v. Gabrion*, 517 F.3d 839, 866-76 (6th Cir. 2008) (Judges Batchelder and Moore found general, federal criminal subject matter jurisdiction in national forests, and Judge Merritt dissented on a separate ground that 16 U.S.C. § 480 does not criminalize murder in the national forests). Given the current posture of the case and given our previously separately stated views on subject matter jurisdiction, all members of the panel join Judge Moore's opinion, cited above, in parts III, IV and V, which addresses these issues.

## VI. Gabrion's Request to Proceed Without Counsel

In *Faretta v. California*, the Supreme Court observed that the Sixth Amendment creates a right to self-representation. 422 U.S. 806, 818–32 (1975). However, the right to self-representation "is not absolute." *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 161 (2000) (holding that defendants have no right to self-representation on appeal). "Even at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own

lawyer." *Id.* at 162. In *Faretta* itself, the Court noted that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." 422 U.S. at 834 n.46. For this reason, "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.*; *cf. Illinois v. Allen*, 397 U.S. 337, 342–43 (1970) (holding that a defendant can forfeit his Sixth Amendment right to be present in trial if he insists on being "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom").

In Section I above, we set out Gabrion's attempts to disrupt the trial. His attempt to represent himself was part of that effort. Gabrion unequivocally asserted his right to self-representation in a motion filed with the District Court in October 2001. In that motion, he called his appointed counsel "evil," "corrupt," and "liars," and he accused them of stealing $1800 from him. Only two months earlier, during a hearing on whether Gabrion should undergo a competency evaluation, Gabrion interrupted the proceedings and was ejected from the courtroom immediately after the following exchange:

> DEFENDANT GABRION: Sir, the victim's family and the public deserve to know the truth from me.
> THE COURT: Sir, I haven't addressed you yet. You'll be quiet if you would, please.
> [To the government:] You may proceed.
> [THE GOVERNMENT:] Thank you.
> DEFENDANT GABRION: [My appointed counsel] has destroyed evidence that Charles Cass murdered Rachel Timmerman.
> THE COURT: Sir, sir, either you're quiet today or you go upstairs and sit in the cell. The choice is yours.
> DEFENDANT GABRION: My choice is to fire [my appointed counsel] for being satanic and destroying evidence that Charles Cass murdered Rachel Timmerman.
> THE COURT: One more question, one more outburst –
> DEFENDANT GABRION: I have no possibility of getting a fair judge –
> THE COURT: Take him upstairs.
> DEFENDANT GABRION: – where the judge had sex with a 14-year-old girl last week and got another 13-year-old pregnant that I know of that I can take these people to right now. I got zero possibility. You're

nothing but an evil Hitler. Shit. And why don't you tell the FBI to go arrest that perverted bastard.

The District Court denied Gabrion's motion to proceed pro se in a four-page opinion. The opinion asserted that Gabrion's "disruptive behavior in this Court, his abusive and obscene language in motions and letters, and his failure to heed the advice of counsel on commonsense issues concerning his pretrial behavior, convince this Court that [Gabrion] will not be willing or able to follow the 'ground rules' of trial procedure." One month later, Gabrion filed a motion for reconsideration, in which he apologized and promised to conform his conduct to the rules of the courtroom. Later that same day, however, at a hearing on a motion to suppress, Gabrion consistently interrupted the proceedings. The District Court denied that motion and indicated its "grave doubts regarding [Gabrion's] ability to conform himself" to minimum standards of courtroom behavior.

Given the totality of Gabrion's disruptive behavior, the District Court did not err in precluding Gabrion from representing himself. Gabrion's behavior not only fell below the accepted minimum for courtrooms; it was of such a character that would be unacceptable in any corner of a civil society. The District Court had every reason to believe this conduct would continue — and on a more prominent stage — if Gabrion were given the opportunity to represent himself. Considering how Gabrion interrupted courtroom proceedings several times only hours after promising to conform, the District Court was entitled to view that promise as empty and simply more manipulative rhetoric.

It may be a better practice for trial courts to give the benefit of the doubt to misbehaving defendants who invoke their right to self-representation and then revoke that right if they disrupt the case. But the District Court did not need to do so with Gabrion.[10] At the time he moved to represent himself, he had been persistently disruptive and deeply disrespectful in court. He had filed numerous bizarre motions and letters. He had committed forty major infractions while incarcerated at Calhoun County

---

[10]The Supreme Court's recent opinion in *Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008), provides trial courts with another potential option for dealing with psychopathic defendants like Gabrion who assert a desire to represent themselves. In that case, the Court held that a defendant may meet the standard to be competent to stand trial with the assistance of counsel yet be incompetent to represent himself. *Id.*

Jail.  Given his unbroken pattern of misconduct both inside and outside of the courtroom, the only possible inference was that his serious misbehavior would continue if he represented himself.  Under such circumstances, we do not require the District Court to undertake the empty and time-consuming formality of granting his right to self-representation only to revoke it days later.  To do so would be to facilitate the same type of disruptive and abusive conduct the Court condemned in *Faretta*.  Accordingly, the District Court properly denied Gabrion's motion to proceed pro se.

## VII.  Whether Gabrion's Physical Assault of his Counsel in Court Required the Withdrawal of his Trial Counsel or a Mistrial

Gabrion argues that the District Court should have granted his trial counsel's motion to withdraw and motion for a mistrial after Gabrion physically assaulted one of his attorneys, David Stebbins, in front of the jury.  The attack occurred during the first day of the penalty proceedings.  Shortly after Gabrion punched Stebbins in the head, Stebbins made oral motions for a mistrial and to withdraw as counsel.  The District Court denied the motions.  Stebbins later renewed those motions, and this time Paul Mitchell, Gabrion's other trial counsel, also sought to withdraw.  The District Court again denied the motions, reasoning that there was no good cause for withdrawal, that Gabrion was trying to manipulate the proceedings, that Stebbins and Mitchell were conscientious and diligent, and that the same problems would almost certainly occur in a new trial.  For the reasons below, we find that the District Court did not abuse its discretion in denying both motions.

## A.  The Motion to Withdraw as Gabrion's Trial Counsel

"When reviewing a District Court's denial of a motion to withdraw or substitute counsel, we generally must consider: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice."  *United States v. Mack*,

258 F.3d 548, 556 (6th Cir. 2001).  "We review the district court's denial for abuse of discretion."  *Id.* at 555–56.

The District Court adequately considered the matter in its written opinion. Although it is undeniable that a conflict existed between Gabrion and his trial counsel after the physical assault, that conflict did not cause a total lack of communication:  the District Court found in its opinion that Gabrion communicated with his counsel after the assault.  (J.A. 560.)  The fourth factor from the *Mack* case is perhaps the most persuasive.  If the District Court had granted the motion to withdraw, it would have had two conceivable options:  appoint substitute counsel for Gabrion, or hold that Gabrion forfeited his right to counsel and had to represent himself for the remainder of the proceedings.[11]  The former option would have delayed the sentencing phase for months as substitute counsel caught up to speed, thereby significantly detracting from the prompt and efficient administration of justice.  The latter option would have undermined the public interest by permitting a psychopathic defendant to manipulate the proceedings so that he would represent himself, rather than be represented by trained and conscientious counsel.  Among the conceivable options presented by Gabrion's conduct, we believe the District Court chose the correct one.  Accordingly, we hold that the District Court did not abuse its discretion by denying counsel's motion to withdraw.

**B.  The Motion for a Mistrial**

"A defendant may move for a mistrial where there is a legitimate claim of seriously prejudicial error such that the defendant is unable to obtain a fair trial."  *United States v. Phibbs,* 999 F.2d 1053, 1066 (6th Cir. 1993) (internal quotation marks omitted). "The denial of a mistrial is generally within the discretion of the trial court, and our review of the court's ruling is confined to whether the trial court abused its discretion." *Id.* (internal quotation marks omitted).

---

[11]Although neither the Supreme Court nor the Sixth Circuit has directly held that an indigent defendant can forfeit his right to counsel by his extremely serious misconduct, at least two other circuits have so held, *e.g.*, *United States v. Leggett*, 162 F.3d 237, 250-51 (3d Cir. 1998); *United States v. McLeod*, 53 F.3d 322, 325 (11th Cir. 1995).  We express no opinion here as to whether the right to counsel may ever be forfeited by misconduct, and if so, whether Gabrion would have forfeited it in this particular case.

Other circuits have refused to permit mistrials when the prejudicial event was a defendant's own unprovoked outburst in court. *E.g.*, *United States v. Harris*, 2 F.3d 1452, 1456 (7th Cir. 1993); *United States v. West*, 877 F.2d 281, 288 (4th Cir. 1989); *United States v. Aviles*, 274 F.2d 179, 193 (2d Cir. 1960). As these cases recognize, "[t]o allow a defendant by his own misconduct to terminate his trial even temporarily would be to allow him to profit from his own wrong." *Harris*, 2 F.3d at 1456. Such a precedent also could have negative effects on future trials: "it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so." *Aviles*, 274 F.2d at 193; *accord West*, 877 F.2d at 288 (reasoning that permitting mistrials in this situation would "encourage future misconduct by defendants").

To grant a mistrial would be to allow a manipulative defendant like Gabrion to delay his own sentencing through dangerous misconduct. It would also set a bad precedent that could be abused by future manipulative defendants. Moreover, the actual prejudice to Gabrion from the jury witnessing this assault may have been less than one would expect, as the assault was consistent with defense counsel's mitigation strategy of presenting Gabrion as the victim of a mental disease. We therefore hold that the District Court did not abuse its discretion by denying Gabrion's motion for a mistrial.

### VIII.  Whether the In Camera Conferences between the District Judge and Gabrion's Defense Counsel Outside of Gabrion's Presence Violated Gabrion's Rights

Gabrion argues on appeal that the District Court committed reversible error by conducting five in camera conferences outside of his presence over the course of the trial. The only people present at these conferences were the district judge, Gabrion's defense counsel, a court reporter, and sometimes a law clerk. All of the five conferences occurred on the record. All but the first conference lasted ten minutes or less, and the first conference lasted just less than twenty minutes. At the time of trial, Gabrion was not aware of any of these conferences. Gabrion argues that these conferences violated his constitutional right to due process and his right to be present for every stage of trial under Federal Rule of Criminal Procedure 43.

A little background on the conferences is helpful. Three of them dealt with ethical problems stemming from Gabrion's desire to testify. At the first conference, defense counsel discussed with the district judge how best to balance Gabrion's right to testify in his defense during the guilt phase of the trial with defense counsel's fear of being accused of suborning perjury. Defense counsel explained that Gabrion insisted on testifying, but defense counsel believed that Gabrion would lie on the stand. The district judge proposed that Gabrion either could submit questions to his counsel in advance or could testify in narrative form pursuant to specific choreographing. After the conference, the district judge met with Gabrion on the record and admonished him that, although he had a right to testify, his testimony must be truthful and would likely create serious strategic risks arising from cross-examination. Gabrion testified regardless. At the second conference, defense counsel and the district judge reflected briefly on whether they had properly balanced Gabrion's right to testify with defense counsel's ethical duties. The fifth conference also involved Gabrion's desire to testify, but this time at the penalty phase of the trial.

The other two conferences dealt with Gabrion's disruptive courtroom behavior and the legal question of the extent to which Gabrion had a right to control trial strategy. One occurred the morning after Gabrion punched defense counsel Stebbins, at the beginning of the penalty phase of the trial. The district judge had ordered that Gabrion must either view the proceedings remotely or be shackled, wear a stun belt, and sit between two U.S. Marshals. Gabrion's defense counsel agreed that this degree of restraint was appropriate, but they told the district judge that they had advised Gabrion to stay out of court, so that the jury would not see him in restraints. The other conference occurred later in the penalty-phase proceedings. Gabrion had insisted to his trial counsel that they cross-examine the government's victim-impact witnesses to accuse those witnesses of murdering Rachel Timmerman. Gabrion's trial counsel wisely believed that accusing the victim's family of being her true killers, after the same jury had already adjudicated Gabrion guilty of her murder, would be terrible strategy, but they sought confirmation from the district judge that they could choose not to follow Gabrion's strategic wishes. At this conference, the district judge agreed. Then, both the

district judge and defense counsel discussed the challenge of balancing Gabrion's right to be present in the courtroom with the risk that his serially disruptive behavior would require repeatedly ejecting him in front of the jury and would subject him to great prejudice.  The district judge concluded the conference by emphasizing "how diligently [defense counsel] are working . . . . and are representing him as well as they can under the circumstances."

## A.  The Due Process Right to Presence at Proceedings

"[A] defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'"  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97 (1934)).  The exclusion of a defendant "should be considered in light of the whole record."  *Id.* at 527.  In *Gagnon*, the Supreme Court held that the four defendants did not have a due process right to be present at an in camera discussion between the trial judge, a defense counsel, and a juror regarding that juror's concerns that one of the defendants was drawing sketches of the jury members.  *Id.*  The Court emphasized that the defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending."  *Id.*  It was merely "a short interlude in a complex trial."  *Id.*

Even though Gabrion was absent from five brief conferences, rather than just one, we believe that his right to due process was not denied.  His absence from the conferences did not have a reasonably substantial relation to his opportunity to defend himself.  As his only argument that these conferences prejudiced him, Gabrion contends that his testimony was "devastating" for his case, and that he might have decided not to testify had he observed at the conferences the strong opinions voiced by both his defense counsel and the district judge that he should not testify.  But Gabrion's defense counsel stated on the record that they had already thoroughly warned him of these dangers.  And the district judge also warned Gabrion on the record immediately after the first

conference and before Gabrion testified during the guilt phase. Both Gabrion's defense counsel and the district judge separately warned him of the risks of testifying, yet he testified regardless. It is exceedingly doubtful that Gabrion would not have testified had he observed his defense counsel and the district judge discuss this matter together. Moreover, Gabrion acknowledges on appeal that he "did not trust his counsel," and he does not attempt to explain why further warnings from people he did not trust would have dissuaded him from testifying. Like the defendants in *Gagnon*, Gabrion would not have gained anything by attending these conferences.

In addition, Gabrion's absence from the conferences did not thwart a fair and just hearing; on the contrary, the conferences demonstrated the admirable efforts of defense counsel and the district judge to protect Gabrion's rights and to facilitate a fair hearing for Gabrion despite his disruptive antics. Gabrion argues on appeal that these conferences "kept him in the dark about his own defense" and that his defense counsel were "disloyal." Quite the opposite. During the conferences, the district judge and defense counsel consistently emphasized the importance of Gabrion's right to testify and his right to be present in the courtroom, but they had to carefully balance those rights against the likelihood that Gabrion would commit perjury and the prejudice he would cause himself by remaining in front of the jury. They chose to perform this balancing on the record. They walked an ethical tightrope—created by Gabrion's willingness to lie on the stand and his disruptive behavior in court—while still seeking to protect his rights and minimize harm to his case. Rather than being disloyal, defense counsel showed great dedication to Gabrion, even after he punched one of them in the face. Gabrion received a fair and just hearing regardless of his preclusion from the conferences. Accordingly, his right to due process was not denied.

**B. The Right to Presence at Trial under Federal Rule of Criminal Procedure 43**

Subject to several exceptions, Federal Rule of Criminal Procedure 43 provides that "the defendant must be present at . . . every trial stage." Fed. R. Crim. Pro. 43(a)(2). Although Rule 43 stems from the Constitution, it "includes common-law rights and is broader than the protection provided in the Fifth and Sixth Amendments." *United States*

*v. Gibbs*, 182 F.3d 408, 436 (6th Cir. 1999). In camera conferences are a stage of the trial within the meaning of Rule 43. *United States v. Brown*, 571 F.2d 980, 986 (6th Cir. 1978) (citing *United States v. Gay*, 522 F.2d 429, 435 (6th Cir. 1975)). However, harmless error analysis applies to violations of Rule 43, so reversal is required only if the defendant was prejudiced by the error. *Brown*, 571 F.2d at 987.

Even assuming that Gabrion had a right to attend the conferences under Rule 43, in spite of the likelihood of disruptive conduct and his attacks on his lawyer, he was not prejudiced by his absence. As discussed more thoroughly above, Gabrion cannot credibly argue that he would not have testified had he attended the conferences. He has no other claims of prejudice, so he would not have gained anything by attending the conferences. Any violation of Rule 43 from Gabrion's absence from the in camera conferences was therefore harmless error. Accordingly, we will not reverse the District Court on this claim.

## IX.   The District Court's Decision Not to Disclose a Report Suggesting That a Government Witness May Have Been Biased Against Gabrion

Gabrion argues that the District Court erred by not disclosing to defense counsel a report by the Department of Justice's Office of Professional Responsibility. The report concluded that Chrystal Roach, a Michigan county prosecutor who temporarily served as a Special Assistant U.S. Attorney for pre-trial proceedings against Gabrion, violated federal regulations by making improper public comments about Gabrion's case several weeks after the initial indictment. The report suggested that Roach may have had a vendetta against Gabrion; Roach lost her federal appointment due to her public statements. The prosecution called her as a witness during the guilt phase of the trial over two years later. She testified briefly on peripheral issues. The government submitted the report to the District Court, which decided not to disclose it to defense counsel.

Gabrion argues that this report would have been effective impeachment material and that he therefore was entitled to receive it under *Brady v. Maryland*, 373 U.S. 83 (1963). He also argues that the District Court's decision not to disclose the report

violated his right under the Confrontation Clause to demonstrate the bias of a government witness. He requests a new trial. For the reasons below, we find that both arguments lack merit.

**A. Whether the Ethical Report Was *Brady* Material Requiring Reversal**

Pursuant to *Brady*, the government must give to a defendant evidence in its possession that is both favorable to the defendant and material to his guilt or punishment. *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999). "[I]t is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)). However, a defendant is entitled to a new trial for recently discovered *Brady* evidence only when the evidence is material. *Id.* Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 1012 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability does not mean a mathematical probability of 51 percent or more; rather, it is simply "a probability sufficient to undermine confidence in the outcome," *id.* "Because materiality under *Brady* presents a mixed question of law and fact, our standard of review is de novo." *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir. 1991) (internal citations omitted).

Although the report may have been helpful to impeach Roach and therefore was exculpatory and should have been disclosed, we confidently believe that its absence did not affect the result of the guilt phase of the trial. The evidence that Gabrion had murdered Rachel Timmerman was simply overwhelming. Three witnesses testified that Gabrion had made statements to them incriminating himself in her murder. Others testified that they saw Gabrion near Oxford Lake shortly before her body was found there. Several expert witnesses testified that materials found on her corpse matched materials from Gabrion's home. Significantly, none of these witnesses was Chrystal Roach. Roach testified only as to peripheral and uncontested facts: the progress of Gabrion's rape trial in state court, and a letter the district attorney's office received, purportedly from Rachel Timmerman, retracting her rape allegations. Roach's testimony

was far from critical in establishing Gabrion's guilt.  *Cf. Schledwitz*, 169 F.3d at 1016–17 (vacating defendant's conviction where the withheld impeachment information involved a "key" witness).  There is almost no chance that the result of the guilt-phase proceedings would have been different had Gabrion received the report.  Accordingly, the report was not material, and Gabrion is not entitled to a new trial on these grounds.

**B.  Whether Gabrion's Confrontation Clause Right to the Opportunity for Cross-Examination Was Denied**

Gabrion similarly argues that the District Court denied him his constitutional right to cross-examine Roach with the Department of Justice report.  The Sixth Amendment right to confrontation secures for defendants the ability to impeach prosecution witnesses for bias.  *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986).  In *Van Arsdall*, the Supreme Court held that the defendant's right to confrontation was violated when the trial court "prohibited *all* inquiry" into the possibility that a witness was biased.  *Id.*  But it also held that the denial of this right is subject to harmless error analysis.  *Id.* at 684.  Whether the error is harmless beyond a reasonable doubt depends on the following factors:  "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Id.*

We first note that it is not at all obvious that Gabrion's constitutional right to impeach Chrystal Roach for her bias was denied.  Although the District Court chose not to disclose the Department of Justice report to Gabrion, Gabrion does not allege that the District Court prevented him from using other materials—including her public statements that gave rise to the report—to impeach Roach for her bias.  His case is thus unlike *Van Arsdall*, where the trial court completely shut down any inquiry into bias.  In any event, we need not decide whether his right to cross-examination was denied, because any such denial would plainly constitute harmless error.  As discussed above, the prosecution's case against Gabrion at the guilt phase of the trial was overwhelming,

and Roach's testimony pertained to peripheral matters and uncontroverted facts. We therefore hold that Gabrion is not entitled to a new trial on these grounds.

### X.  The Removal of a Juror Who Was Allegedly Sleeping

Under Federal Rules of Criminal Procedure 24(c), a trial court may, in the exercise of its sound discretion, substitute an alternate juror for a regular juror who has become unable or disqualified to perform his duties. The trial court's exercise of its discretion in this regard is not to be disturbed absent a showing of bias or prejudice to the defendant. According to Rule 24(c), the trial court is authorized "to replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Under what circumstances and on what grounds is the trial judge justified in taking such action? The Third Circuit answered this question in the following manner:

> [T]he trial judge, in his sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired.

*United States v. Cameron*, 464 F.2d 333, 335 (3rd Cir. 1972). We agree with this analysis and hold that the trial court's exercise of this discretion is not to be disturbed absent a showing of bias or prejudice to the defendant. *See, e.g.*, *United States v. Domenech*, 476 F.2d 1229, 1232 (2nd Cir. 1973); *United States v. Maxwell*, 383 F.2d 437, 443 (2nd Cir. 1967).

In the instant case, the government requested on two occasions that a juror be removed for nodding off during the trial. Defense counsel did not think she was sleeping and did not want her removed. The judge agreed that he saw that her eyes had been closed, but said she would not be removed and replaced at that time. However, he explained to the attorneys that if he excused her at all he would do it privately so as not to embarrass her. The government attorney agreed verbally on the record to this plan and defense counsel did not say anything further at that time about the issue. Tr. at 1606-07.

At the conclusion of the evidence and after the judge had instructed the jury, the judge told the jury that four of them were alternates and that he would be excusing the four from deliberations.  He then read off four numbers, including Number 84, the allegedly sleeping juror.  As soon as the jury left the room to begin deliberations, defense counsel told the judge that he had not read the correct numbers in excusing the four jurors.  The judge responded "Yes, I took out No.84.  She was the one who . . . had been snoozing.  She was allegedly snoozing.  I found she was.  She continued, and today I found her again glassy-eyed and inattentive.  So I'm pulling her off as a person.  The other three . . . were definitely alternates.  So I pulled her off and I put No.  112 who was an alternate in her spot.  Okay?"  Defense counsel responded, "Okay," and proceeded to ask the judge who would be the next  alternate seated if another juror needed to drop out.  Tr. at 1769-1770.

While the record does not reflect that the judge made a clear finding that juror No. 84 had been sleeping before removing her, he alerted the attorneys to what he planned to do if he needed to remove her and he carried out this plan.  Defense counsel had an opportunity to object when told of the proposed plan and then again after juror No. 84 was actually replaced.  He did not, so we review for plain error.

Our review is limited to considering whether there was a deprivation of Gabrion's Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury.  Gabrion has failed to demonstrate that the court's action in removing a juror and denying the request for a new trial deprived him of his right to an impartial jury and, more generally, to a fair trial.

### XI.  Admission of Videotaped Testimony of Coleman and Westcomb

Gabrion contends that his right to confront witnesses against him was violated because two government witnesses, Kathryn Westcomb and Linda Coleman, testified by videotaped deposition at trial.  Coleman testified that she saw Gabrion at Oxford Lake in June 1987 in an older model blue pickup truck with a boat in the back.  He was accompanied by two men and a heavy-set girl with sandy blonde hair, which Coleman, over objection by defense, identified as looking like a photo of Rachel Timmerman.  On

cross-examination, Coleman stated that she did not call the police after seeing Gabrion's photo as a suspect, and she conceded that she refused to testify before the grand jury. Westcomb testified that in the Spring of 1997, her son Lloyd, who suffers from schizophrenia, told her about a conversation he allegedly had with Gabrion in which Gabrion told Lloyd that he had gotten rid of his girlfriend permanently in a bottomless lake with chains and cement blocks. She stated on cross-examination that she did not tell the police about this conversation with her son until three months after Rachel Timmerman's body was found.

Under the Confrontation Clause of the United States Constitution, testimonial, out-of-court statements offered against accused to establish the truth of matter asserted may be admitted only where (1) the declarant is unavailable and (2) where the defendant has had prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Here, Gabrion was present with counsel at both depositions and his counsel extensively cross-examined both witnesses. His argument hinges on the "unavailability" prong of the Sixth Amendment. We review the admission of deposition testimony at trial in place of a live witness for abuse of discretion. *United States v. Campbell*, 845 F.2d 1374, 1377 (6th Cir. 1988).

When the question is one of the health of the witness, there must be "the requisite finding of necessity" which is "case specific" in order to dispense with confrontation in open court. *Maryland v. Craig*, 497 U.S. 836, 855 (1990). When the government is claiming witness unavailability due to illness, the specific inquiry must focus on both the severity and duration of the illness. The court must inquire as to the specific symptoms of the illness to determine whether the witness is physically able to come to the courthouse and testify, and the court must determine whether there is the probability that the illness will last long enough "so that, with proper regard to the importance of the testimony, the trial cannot be postponed." *Burns v. Clusen*, 798 F.2d 931, 937-38 (7th Cir. 1986).

Here, counsel for the government read a letter into the trial record from the doctor for both Ms. Coleman and Ms. Westcomb in which he explained that both women

suffer from "advanced chronic lung disease" and "unstable heart disease." Tr. at 1130. The letter went on to say, "It is my professional opinion [that] neither of these women could tolerate cross-examination in open court without seriously jeopardizing their health and safety. It would not be a surprise to me if they were put into an unusual [sic] stressful circumstance for them to either have a heart attack or simply stop breathing. It is therefor my strong opinion that they not be forced to testify in open court . . . ." *Id.* Ms. Westcomb was wheeled into her deposition on a gurney and Ms. Coleman had an oxygen tank available for her use during the deposition. Tr. at 1134.

The government made a sufficient showing regarding the unavailability of both women through its in-court representations and correspondence from their physician. The doctor's letter was specific as to the nature of each woman's illness and very clear in his opinion that the women's health would be jeopardized if they were forced to testify at the trial. Gabrion relies on *Stoner v. Sowders*, 997 F.2d 209 (6th Cir. 1993), to argue that the witnesses were not "unavailable" for trial. In *Stoner*, the two elderly witnesses came to a police station near the courthouse the day before the trial to give depositions. *Id*. at 211-12. The Court there held their unavailability to be a "legal fiction" and a Confrontation Clause violation. *Id*. at 212. Here, the depositions were taken in Ms. Westcomb's case several months before trial and in Ms. Coleman's case several weeks before trial. The chronic nature and severity of their health problems was specifically explained to the court. In fact, Ms. Westcomb's health was so poor that she died while the trial was in progress.

Because Gabrion was able to, and did, cross-examine both witnesses at their depositions, and because the government sufficiently demonstrated their unavailability to testify at trial, no Confrontation Clause violation occurred. The District Court did not abuse its discretion in admitting the videotaped depositions of Ms. Westcomb and Ms. Coleman.

### XII.  Examination of Gabrion by Government Psychiatrist and Testimony in Rebuttal Concerning Gabrion's Mental Health Evidence as Mitigation

Gabrion contends that he was prejudiced when the prosecution was permitted to call expert witness Dr. Gregory Saathoff to testify in rebuttal during the penalty phase of the trial because Gabrion did not have adequate notice of Dr. Saathoff's testimony. Specifically, Gabrion argues that the examination itself was untimely because it was not conducted until March 8, 2002, between the conclusion of the guilt phase and two days before the start of the penalty phase.  Gabrion also contends that the production of Dr. Saathoff's testimony on March 13, 2002, two days into the penalty phase of the trial, was untimely.  Gabrion also argues that Dr. Saathoff's rebuttal testimony was prejudicial and outside of the scope of the testimony Gabrion provided.

As to the timeliness of the examination and the production of the report, the government filed a discovery request for mental health evidence and for a psychological examination on January 18, 2002 — a little over a month before the guilt phase of the trial commenced and in response to defendant's notice indicating he might raise mental health issues at both the trial and penalty phases.  On February 4, 2002, defendant filed an amended notice of his intention to introduce mental health testimony through five doctors.  In response to Gabrion's notice that he intended to utilize five mental health experts, the government sought four additional examinations of Gabrion by mental health experts.  The District Court granted the request only as to Dr. Saathoff and indicated that it would "strictly limit" Dr. Saathoff's rebuttal testimony to that evidence to which the door was opened by Gabrion first.  Dr. Saathoff examined Gabrion on March 8, 2002, the first day that Gabrion was available due to the necessity that he prepare for and attend the guilt phase of the trial.

We find that Dr. Saathoff's examination and report were timely.  Once the District Court had ruled that Dr. Saathoff could examine Gabrion, an examination took place on one of the first dates that Gabrion was available, which was during the break between the guilt and penalty phases of the trial.  Defense counsel received Dr. Saathoff's report on March 13, five days after the examination.  During the break

between the guilt and penalty phases defense counsel was also submitting supplemental reports and records. There is no indication in the record that the government delayed in its request to examine Gabrion or that Gabrion was caught off guard by the contents of Dr. Saathoff's report. Defense counsel had adequate time to prepare to cross-examine Dr. Saathoff on the contents of his report.

As to Gabrion's argument that Dr. Saathoff's rebuttal testimony was prejudicial and outside the scope of the case-in-chief testimony because it highlighted Gabrion's history of violence toward women and animals, we disagree. Gabrion presented numerous mitigation witnesses, including four mental health experts. While the mitigation evidence was designed to demonstrate Gabrion's poor upbringing, lack of appreciation for the wrongfulness of his conduct, and the existence of mental health issues due to injuries sustained in car accidents, the mitigation evidence also downplayed Gabrion's future dangerousness, especially toward women. Instead, Gabrion was described simply as "nerdish" and not a discipline problem. The government sought to rebut the rather mild image presented during the penalty phase and show instead a man with a violent and cruel nature who could be a threat to prison staff and other inmates. Dr. Saathoff also opined that Gabrion was a malingerer to rebut the findings of two of Gabrion's mental health experts. Even if some isolated remarks by Dr. Saathoff went beyond the scope of Gabrion's mitigation testimony, Dr. Saathoff's testimony as a whole was a fair rebuttal of Gabrion's mitigation evidence and did not unfairly prejudice Gabrion.

### XIII. Unresolved Ethics Complaint Filed Against Government Witness, Dr. Ryan

Gabrion contends that the government withheld evidence of an ethics complaint filed against Dr. Thomas Ryan, a rebuttal expert for the government in the penalty phase, that would have impeached his testimony. Gabrion also contends that his Sixth Amendment right to confrontation was violated by the District Court's refusal to allow defense counsel to cross-examine Dr. Ryan about the ethics complaint. The complaint was a letter filed by a psychologist with the American Psychological Association

regarding Dr. Ryan's consulting work in an unrelated capital case. The substance of the complaint was that Dr. Ryan filed an expert report in a Maryland capital case diagnosing the defendant as a dangerous psychopath without conducting a clinical interview of the defendant. Instead, Dr. Ryan had used records to score the defendant on the "Hare's Psychopathy Checklist." At the time, the methodology conformed to professional standards and had been used in multiple capital cases. However, in light of objections by the defendant in the Maryland case to the use of the Hare Checklist, Dr. Ryan withdrew his report.

At the time of Gabrion's trial in the District Court, the American Psychological Association had not commenced a formal ethics investigation against Dr. Ryan concerning the complaint by a fellow psychologist. The Association had requested a response from Dr. Ryan, which was received by the Association in October 2001. Although defense counsel did not have the actual complaint or Dr. Ryan's response, it was aware of the substance of the documents and the fact that the American Psychological Association had not yet adjudicated the issue. Accordingly, the District Court found that, at most, there was a professional dispute between two psychologists in a collateral matter that was not probative of Dr. Ryan's truthfulness. The District Court also correctly found that examination by defense counsel of Dr. Ryan about an unsubstantiated and unadjudicated matter was not proper and would only confuse the jury, especially as the Hare Psychopathy Checklist had not been administered to Gabrion. We agree with the District Court's decision and reasoning for not allowing the use of the unsubstantiated and unadjudicated ethics complaint and find no error on this issue.

## XIV. The Death Qualification of the Jury

Gabrion argues that the District Court erred by engaging in a lopsided jury selection process in which prospective jurors who expressed pro-death penalty views were empaneled, while their anti-death penalty counterparts with equally strong opposing views were struck for cause. In essence, Gabrion's argument is that the

District Court's systematically uneven treatment of prospective jurors violated his constitutional right to an unbiased jury under the Sixth Amendment.**[12]**

"A criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968)). "[A] juror who is substantially impaired in his or her ability to impose the death penalty under the [statutory death-penalty] framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible." *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). Although *Uttecht*, *Witt*, and *Witherspoon* involved challenges to anti-death penalty jurors, the rule of substantial impairment applies equally to prospective jurors whose attitudes rest at the opposite end of the ideological spectrum. *See Morgan v. Illinois*, 504 U.S. 719, 728–29 (1992) (applying *Witt* to reverse a death sentence due to the empaneling of a single pro-death penalty juror).

If jurors who initially express some doubts about the death penalty are excused for cause but jurors who initially express a preference or inclination in favor of the death penalty in murder cases are accepted, as occurred in the instant case, the jury cannot be "a representative cross-section of the community." The Supreme Court has recently made jury sentencing a constitutional requirement. *Ring v. Arizona*, 536 U.S. 584 (2002). Juries have plenary power to choose between life and death in these cases. Thus the way the jury is selected may become the most important determinant of the sentencing outcome. Both the people who have no scruples about the use of the death penalty and those who have serious doubts are part of "the people" whose "will" the jury is designed to represent in our legal system. "[A] jury that must choose between life imprisonment and capital punishment can do little more — and must do nothing less —

---

**[12]**Gabrion also argues that the lopsided selection structure violated his guarantees to due process and equal protection of the law under the Fifth Amendment. However, he only presents one page of legal argument to this effect in his brief, and the only two federal cases he cites—*Ward v. Village of Monroeville*, 409 U.S. 57, 62 (1972), and *In re Murchison*, 349 U.S. 133, 136 (1955)—found due process violations where the trial judge suffered from an obvious conflict of interest, which Gabrion does not allege existed in this case. Because this aspect of his argument is underdeveloped, we do not consider it here.

than express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). The "community" is deeply divided on the death penalty. *See* David Garland, *Peculiar Institution: America's Death Penalty In An Age of Abolition*, 36-55 (2010). If strenuously pro-death penalty jurors are going to be permitted, jurors who lean against the death penalty should not be removed for cause. Otherwise, such a lopsided jury can hardly express the "will of the people."

In light of these principles, Gabrion's argument has some force. In written responses to questionnaires and orally during voir dire, three prospective jurors expressed strong personal views in favor of death sentences for all convicted murderers,[13] and three prospective jurors expressed equally strong personal views against the death penalty.[14] All six prospective jurors made statements that unmistakably suggested that their deeply held personal views—either for or against the death penalty, respectively—would prevent them from faithfully applying the nuanced statutory system of weighing aggravators and mitigators during the penalty phase. But when pushed by the district judge or counsel, all six equivocated and stated that they could temporarily put aside their personal beliefs, listen to evidence, or weigh the statutory aggravators and mitigators. The responses of the six jurors presented near-

---

[13]The three prospective jurors with strong pro-death penalty attitudes were Alan Wehler, Terry Herrington, and Roy Erickson. During voir dire, Wehler said that for "premeditated murder or something like that, yeah, I do believe in an eye for an eye." (JA 2508.) But in his questionnaire, Wehler said that he would judge the evidence fairly and impartially. Terry Herrington stated that he was in favor of the death penalty "in every case where someone voluntarily kills another . . . except an act of war." (JA 944.) In other words, "if it was intentional, you know, an eye for an eye." (JA 948.) But in his questionnaire, Herrington said that he would weigh aggravators and mitigators and would follow the court's instructions. Erickson stated in his questionnaire that "the death penalty is appropriate for all crimes involving murder." (JA 969.) Similarly, he said in voir dire that once "the aggravating circumstances are proven, that's it." (JA 971.) But Erickson also said in voir dire that he would listen to evidence and would consider life imprisonment. (JA 968–70.)

[14]The three prospective jurors with strong anti-death penalty attitudes were Timothy Donahey, Eric Hemmeke, and Shelly Abrahams. In his questionnaire, Donahey checked a box stating that he could never impose the death penalty. At voir dire, Donahey admitted that his personal views "might" influence his sentencing decision. (JA 862–63.) But when asked whether he could impose the death penalty if the law so required, Donahey clearly responded: "Yes, I could consider it." (JA 864.) Hemmeke also checked the box on the questionnaire stating that he could never impose the death penalty. Hemmeke said at voir dire that he was "pretty set in the no death penalty." (JA 938.) But Hemmeke made clear that if the facts were there and the murder were gruesome, he could maybe go with the death penalty. (JA 939.) Abrahams stated in his questionnaire that the death penalty was appropriate for certain crimes, but in voir dire he expressed a change of heart and said that his moral values could possibly interfere with his choice of sentence. (JA 953–55.) But he also pellucidly stated that he could weigh the aggravators and mitigators as required by the law. (JA 956.)

perfect symmetry on both ends of the ideological spectrum: three pro death-penalty (but equivocating) jurors, and three anti-death penalty (but equivocating) jurors.

But while the revealed attitudes of the prospective jurors were symmetrical, the District Court's treatment of them was not. The District Court struck all three of the anti-death penalty jurors for cause over Gabrion's objection, but it empaneled all three of the pro-death penalty jurors despite Gabrion's motion to strike for cause. The District Court reasoned that two of the anti-death penalty jurors equivocated, and that the other one was guilty of "fuzzy thinking." Regarding their three pro-death penalty counterparts, the District Court was silent on the equivocation of one and attributed the inconsistent responses of the two others to their lack of a college education.

We are troubled by the appearance of uneven treatment in how the District Court handled the pro-death penalty and anti-death penalty jurors during the jury selection process.[15] Of course, the determination of whether a prospective juror's attitude regarding the death penalty will substantially impair him from applying the statutory penalty-phase framework involves some inferences that cannot be made from a bare transcript alone. "[T]he trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." *Uttecht*, 551 U.S. at 9. But when the transcript suggests systematically uneven treatment of equivocating pro- and anti-death penalty jurors, it is increasingly unlikely that the sole culprit is differences in the demeanor of those jurors. We need not definitively resolve the issue in this case, however, because any error affected only the penalty phase of the trial,[16] and we are

---

[15] Our concern is amplified by the fact that the prospective jurors were all drawn from a state that has abolished the death penalty by legislative and state constitutional enactment. No Supreme Court opinion has yet considered whether the standard death-qualification rules apply with equal strength under such circumstances, or instead whether those rules give way to the fundamental constitutional values of federalism and of a defendant's right to a jury that is a fair cross-section of the community. *United States v. Fell*, 571 F.3d 264, 283-86 (2d Cir. 2009) (Calabresi, J., dissenting from denial of rehearing en banc). A strong argument exists that the latter should occur, thereby making it harder for the government to strike for cause anti-death penalty jurors in prosecutions in states that have abolished the death penalty. *Id.* Although we do not reach that issue here, we note the irony of the District Court's empaneling an emphatically pro-death penalty jury in an anti-death penalty state.

[16] Regarding the guilt phase of capital trials, the Supreme Court has suggested that errors in death qualification do not require reversal. *See Lockhart v. McCree*, 476 U.S. 162, 183 (1986) ("reject[ing]" the contention that *Witherspoon* has "broad applicability outside the special context of capital sentencing"). Moreover, any error would be harmless with respect to the guilt phase due to the overwhelming evidence,

already reversing the District Court and remanding for a new penalty phase on the independent ground of improperly excluding relevant mitigating evidence.

### XV.  Constitutionality of the Act's Penalty Phase Evidentiary Standard

Gabrion next asserts that the Federal Death Penalty Act is facially unconstitutional, because it provides that the Federal Rules of Evidence ("the Rules") do not apply to material presented by the parties during the penalty phase of a death penalty trial.  This issue is one of first impression in this Circuit, but every other circuit which has confronted it has rejected this argument and upheld the Act.  *See United States v. Fulks*, 454 F.3d 410, 437 (4th Cir. 2006); *United States v. Lee*, 374 F.3d 637, 648–49 (8th Cir. 2004); *United States v. Fell*, 360 F.3d 135, 140–46 (2d Cir. 2004); *United States v. Jones*, 132 F.3d 232, 241–42 (5th Cir. 1998).  We join those circuits, reject Gabrion's argument, and decline to find the Act unconstitutional on this basis.

The Act provides in relevant part that during the penalty phase of a death penalty trial, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Gabrion's principal argument is that this evidentiary standard's constitutionality is foreclosed by the Supreme Court's reasoning in *Ring v. Arizona*, 536 U.S. 584 (2002).  *Ring* invalidated Arizona's death penalty statute—which provided that, after a capital defendant was found guilty by a jury, the trial judge himself would find aggravating factors required for the imposition of the death penalty sentence—as unconstitutional under the Sixth Amendment right to a trial by jury.  *Ring*, 536 U.S. at 588-89.  The core holding of *Ring* is that where a death penalty statute requires aggravating facts to be found before the death penalty is imposed, those facts must be found by a jury, not by a judge.  *Id.* at 609.  Gabrion asks us to extend this reasoning one step further and hold that those aggravating facts must, as a constitutional matter, be proven to the jury using evidence admissible

---

detailed elsewhere in this opinion, of Gabrion's guilt.

under the Rules.  He is apparently raising this constitutional argument for the first time on appeal, and so our review is for plain error.  Fed. R. Crim. P. 52(b); *United States v. Murphy*, 241 F.3d 447, 450–51 (6th Cir. 2001).

Gabrion's argument consciously takes as its inspiration a decision of the District Court in *United States v. Fell*, 217 F. Supp. 2d 469 (D. Vt. 2002), *rev'd*, 360 F.3d 135 (2d Cir. 2004), which found the relevant provision of the Act unconstitutional under the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment.  That decision was reversed in a thorough and well-reasoned opinion of the Second Circuit, and we largely follow their analysis in disposing of Gabrion's argument in the instant matter.

We begin by noting that the Federal Rules of Evidence are not a collection of constitutional rules:  the limitations on the introduction of evidence presented by the Rules are not coextensive with the limitations required by the Constitution.  *See Dowling v. United States*, 493 U.S. 342, 352–54 (1990) (finding, in the admission of evidence at trial, an error under the Rules, but declining to find a constitutional error); *Fell*, 360 F.3d at 144–45 (following this reading of *Dowling* and other cases and concluding that "[the Rules] establish neither the floor nor the ceiling of constitutionally permissible evidence").  Where a given evidentiary rule is not inconsistent with a constitutional principle, Congress retains "the ultimate authority to modify or set [it] aside." *Dickerson v. United States*, 530 U.S. 428, 437 (2000).

In the Federal Death Penalty Act, Congress enacted an evidentiary standard governing the penalty phase of capital prosecutions that provided that the Rules do not apply, and left only one limitation on the admission of "information" (notably, the relevant provision does not even speak of "evidence"):  that information "may" be excluded if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Gabrion on appeal argues that the constitutional principle with which this provision is inconsistent (and therefore outside of Congress's authority to enact) is the one announced in *Ring*:  that

aggravating factors, the proof of which is part of the business of the penalty phase, must be proven to a jury beyond a reasonable doubt. The link between *Ring*, which concerned primarily the identity of the trier of fact and not the standards limiting the material introduced before it, and Gabrion's present argument is reliability: Gabrion argues that, since *Ring* required proof of aggravating factors to be made to a jury and not to a judge, that proof should be reliable, and reliability would best be guaranteed by Rules, which govern other matters proven before juries in federal court.

Concerns about reliability are obviously at their apogee when the determination is literally one of life and death, as is the case in capital sentencing proceedings. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (stating that "[the] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"). The problem with Gabrion's argument is his contention that, in the capital sentencing context, the Rules are the only means of assuring reliability, so much so that their application is constitutionally required. On the contrary, the unique context of the penalty phase—the ultimate object of which is not the determination of the objective fact of the defendant's guilt or innocence but the much more abstract, irreducibly *moral* determination of whether an individual, already adjudicated guilty, deserves mercy or death—presents distinct reliability concerns that could be plausibly thought to merit a different, much broader set of limitations on what information may be considered. The Supreme Court has long recognized this to be the case. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 204 (1976) ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); *Williams v. New York*, 337 U.S. 241, 246 (1949) (noting the "sound practical reasons" for having "different evidentiary rules govern[] trial and sentencing procedures"). What may distract a jury in the guilt phase from its narrow determination of guilt or innocence—a defendant's good or bad character, as demonstrated through prior acts, for example—may be vital to its determination of whether the particular guilty defendant before it deserves society's ultimate punishment. Accordingly, Congress's decision to relax the evidentiary standard for this specific purpose is no constitutional defect.

Gabrion also contends that the Act may only be deemed constitutional if we create a new "federal capital murder" offense that would treat the aggravating factors as elements of the offense, as, he argues, is required by *Ring*.  He continues that we should not create such an offense, citing principles of constitutional avoidance, separation of powers, and the longstanding proscription against the creation of common law crimes. A similar argument was raised and rejected by the Eighth Circuit in *United States v. Lee*, 374 F.3d 637, 648–49 (8th Cir. 2004), and we reject it here as well.  We do not need to construe the Act as creating a new offense not already specified; as stated above, the Act complies with *Ring* by requiring aggravating facts to be found by a jury, not by a judge.

## XVI.  Constitutionality of Other Acts Information Admitted During Penalty Phase Supporting "Future Dangerousness" as a Non-Statutory Aggravating Factor

Gabrion next challenges the admission during the penalty phase of information concerning unadjudicated criminal conduct and other "bad acts" unrelated to the charged murder of Rachel Timmerman.  During the penalty phase of Gabrion's trial, the Government introduced, primarily through testimony, information concerning a wide array of acts committed by Gabrion demonstrating his future dangerousness, which the Government sought to prove was an aggravating factor tending to make the death penalty a more appropriate sentence.  Uncharged conduct allegedly committed by Gabrion discussed during the penalty phase included:  acts of animal cruelty, prior acts of assault and sexual misconduct, and even three uncharged homicides concerning individuals whose disappearance the Government sought to link to Gabrion.[17]  Finding no error in the admission of this information, we reject this argument.

_____

[17]In his brief on appeal, Gabrion treats these last allegations concerning the uncharged homicides as a separate claim of error.  Because the legal question involved is essentially identical to that governing his claim concerning the other uncharged acts, we treat the two claims of error together.

**A.  Standard of Review**

The procedural posture of this issue is somewhat complicated.  In the their death penalty notice, the Government gave notice, pursuant to the relevant provision of the Act, of their intention to prove as a so-called "non-statutory" aggravating factor that Gabrion was "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others."  *See* 18 U.S.C. § 3592(c) (authorizing the consideration of "any other [i.e., other than the enumerated statutory aggravating factors] aggravating factor for which notice has been given").  Gabrion then made a comprehensive motion to dismiss the death penalty notice, and challenged the constitutionality of this future dangerousness aggravating factor with a variety of arguments, including that it was unconstitutionally vague and that it was irrelevant to the sentencing decision.  He further asked the District Court, in the alternative, to limit information concerning this factor to that which concerned Gabrion's future dangerousness in a prison setting.  The court denied Gabrion's motion in all respects.

Now on appeal, Gabrion challenges specific pieces of information introduced during the penalty phase concerning a wide array of uncharged "bad acts," largely on the basis that Gabrion was never criminally convicted of those acts.  The relationship between this argument and his arguments made in his motion to dismiss the death penalty notice made before the District Court is, to say the least, unclear.  Nonetheless, even were we to construe Gabrion's arguments now on appeal as being sufficiently similar to the ones made in his prior motion such that they were potentially preserved for appellate review, his failure, candidly admitted by appellate counsel in their brief on appeal, to renew them contemporaneously to the information's introduction during the penalty phase limits our review to plain error.  *Cf. United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000) (reaching a similar conclusion in the analogous context of a defendant whose motion in limine to exclude evidence was not renewed contemporaneously to that evidence's admission at trial).

**B.  Unadjudicated Prior Acts and Future Dangerousness**

Gabrion on appeal does not appear to contest the proposition that future dangerousness is sufficiently relevant to the decision making of the penalty phase jury to qualify as a non-statutory aggravating factor under 18 U.S.C. § 3292(c).  Instead, Gabrion's core argument appears to be that information concerning unadjudicated prior acts of convicted capital defendants should not be admissible during the penalty phase of a capital trial to prove future dangerousness, solely by virtue of the fact that those acts were unadjudicated.  Much like his claim arguing for the application of the Federal Rules of Evidence during the penalty phase, the primary reason Gabrion offers for imposing this limitation, which he would have us elevate to a constitutional requirement, is reliability:  he argues that reliability would be best guaranteed by limiting the acts concerning which information may be presented to acts for which the capital defendant has already been tried and convicted.

But, as already discussed, the penalty phase presents a different context for addressing reliability than the guilt phase, which requires the jury to make a determination of considerably narrower scope.  The Act's loose evidentiary standard and its broad definition of aggravating factors (balanced with, as Section II of this opinion demonstrates, a correspondingly broad definition of mitigating factors) represent a preference by Congress for maximizing the information about a capital defendant available to the jury during the penalty phase, a policy decision that is consistent with Supreme Court precedent in this area, as demonstrated by cases already cited above rejecting Gabrion's argument about the Rules of Evidence.  *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 204 (1976); *Williams v. New York*, 337 U.S. 241, 246 (1949).

We are hesitant, especially under the limited review under the circumstances of this case, to craft a constitutional rule limiting the introduction of other acts information to acts for which the defendant has been adjudicated criminally guilty.  We join every other circuit that has decided the issue in holding that there is no such constitutional barrier.  *See United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010) (allowing introduction

of unadjudicated homicides during penalty phase); *United States v. Basham*, 561 F.3d 302, 331–32 (4th Cir. 2009) (unadjudicated sexual misconduct); *United States v. Corley*, 519 F.3d 716, 723–25 (7th Cir. 2008) (unadjudicated homicide); *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001) (unadjudicated assaults, burglary, and arson).

Accordingly, the District Court did not plainly err in admitting information concerning unadjudicated acts committed by Gabrion.

**C.      Limitation of Future Dangerousness Evidence to Dangerousness in the Prison Setting**

Finally, Gabrion argues that we should follow the limitation imposed by some District Courts and restrict the introduction of future dangerousness information to the danger the defendant would present under life without the possibility of parole, the only other possible result of a capital sentencing hearing under the Act.  *See, e.g.*, *United States v. Peoples*, 74 F. Supp. 2d 930, 932–33 (W.D. Mo. 1999) (finding that "dangerousness should not be measured in the same manner as if a defendant were to be 'uncaged'" and declining to permit the introduction of unadjudicated burglaries during penalty phase).  However, we need not decide this issue here, as Gabrion does not indicate which of the unadjudicated acts alleged would be relevant only outside the prison context, and it is unclear to us which acts would fall outside of this limitation, were we to impose it.

**XVII.  Propriety of Remarks by Prosecutor During Closing Argument**

Gabrion next challenges the propriety of remarks made by the prosecution during the closing argument of the penalty phase.  During closing argument, the prosecution argued that Gabrion "owe[d] a debt he can never repay" to Rachel Timmerman's family, and that the mitigating factors proferred by the defense "don't balance the ledger book." The prosecution also pointed out that Gabrion had not expressed remorse for the murder. Gabrion on appeal argues that these remarks were improper and were designed to incite an improperly retaliatory or vengeance-based sentencing decision from the jury. Finding no impropriety in the prosecutor's remarks, we reject this argument.

We analyze claims of prosecutorial misconduct based on improper statements under a two-part test: we ask first whether the remarks were improper, and then whether they were flagrant and warrant reversal. *United States v. Carroll*, 26 F.3d 1380, 1387–88 (6th Cir. 1994). This claim can be resolved under the first part of the *Carroll* test, as the remarks were simply not improper. Despite Gabrion's apparent suggestions to the contrary, the prosecution never argued that the jury had a "duty" to impose death, or that Gabrion owed the victim's family a debt he could only repay with his life. The "ledger book" reference was a proper way of articulating the Government's position that, under the weighing of aggravating and mitigating factors set up by the Act, the balance tipped in the Government's favor. The comment about Gabrion's "debt" did not suggest that Gabrion owed the victim's family his life; indeed, the prosecution was making the very point that the debt could not ever be repaid, no matter the result of their sentencing deliberations. This is fair argumentation from victim impact evidence, allowed by the Supreme Court in *Tennessee v. Payne*, 501 U.S. 808, 827 (1991).

Similarly, the remark about Defendant's lack of expressed remorse does not fall outside the bounds of acceptable argumentation. In the principal case Gabrion cites for this claim of error, the Third Circuit found that a capital sentencing jury's determination had been impermissibly tainted by the prosecution's stating during closing argument that the defendant "didn't even have the common decency to say I'm sorry for what I did." *Lesko v. Lehman*, 925 F.2d 1527, 1540 (3d Cir. 1991). The court held this remark to be an improper comment on the defendant's assertion of his Fifth Amendment privilege against self-incrimination. *Id.* at 1544-45. But here, the Fifth Amendment privilege is not in issue; Gabrion waived it, by both testifying at trial and delivering an allocution. The Government's factually accurate reference to Gabrion's lack of expressed remorse during these two appearances was not an improper attempt to penalize him for exercising his constitutional right, but rather an appropriate argument concerning Gabrion's character.

**XVIII.  Testimony of Victim's Mother Requesting the Death Penalty**

Gabrion contends that his due process rights were violated when the victim's mother, Velda Robinson, was asked "How do you want us to know how you're going to remember Rachel?" and responded "By him being the first to die in the state of Michigan."  The defense contemporaneously objected to this remark, and the court sustained the objection, ordering the response stricken.  Gabrion now contends on appeal that it was reversible error and a denial of due process.

Assuming — without deciding — that an error arose in relation to this isolated remark, and that such an error was not cured by the District Court's striking of it from the record, we are confident that any such error would be harmless beyond a reasonable doubt, the standard for error analysis provided for in the Act.  18 U.S.C. § 3595(c)(2). Ms. Robinson was only one of several of Rachel Timmerman's family members called to prove the Government's victim-impact aggravator, and that aggravator was only one of four that the jury found to be present beyond a reasonable doubt.  In light of these circumstances, it is clear that this remark did not substantially influence the sentencing jury's determination in this case. *Cf. Hain v. Gibson*, 287 F.3d 1224, 1239–40 (10th Cir. 2002) (finding any error in the admission of similar victim impact evidence harmless beyond a reasonable doubt where jury had also found other aggravating factors to be present).  Moreover, as to the penalty of death, we are already vacating the death penalty and remanding for a new sentencing hearing.

**XIX.  Allegations of Jury Bias Based on Post-Trial Juror Comment to Newspaper**

Gabrion next contends that the District Court abused its discretion in refusing his post-trial request for a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), after the jury foreperson was quoted in a post-trial argument in the *Grand Rapids Press* as saying of Gabrion:  "I read your paper religiously.  I knew he was off the wall [before the trial]."  Finding no abuse of discretion, we reject Gabrion's argument.

The District Court is obligated to conduct a *Remmer* hearing whenever the defense raises "a colorable claim of extraneous influence" on a juror. *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (giving as examples of extraneous influences: prior business dealings with the defendant, applying to work for the local district attorney, conducting an out-of-court experiment, and discussing the trial with an employee). As the District Court recognized in rejecting Gabrion's argument below, this is not the classic *Remmer* situation, where a juror has engaged in unauthorized extraneous communications during trial. Instead, the extraneous communications here occurred pre-trial, consisted entirely in the foreperson's reading of media accounts of Gabrion's pre-trial behavior, and were fully disclosed during voir dire, where the foreperson indicated that he was capable of setting aside what he had gleaned from media reports and would decide the case based entirely on information presented in the courtroom.

Preexisting knowledge concerning a case, or even some preexisting opinion as to the merits, does not give rise to a presumption against jury impartiality. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). We decline to hold that contact with media coverage that a juror has disclosed during voir dire rises to the level of extraneous communications requiring a *Remmer* hearing. As the District Court realized, to reach the opposite result would make it impossible for a District Court to seat any juror with any pre-trial knowledge concerning a case, for fear of the verdict's being disturbed by a post-trial hearing on the effect of that pre-trial knowledge on deliberations. Further, it is unclear what purpose a *Remmer* hearing would serve in this context, given that the relevant communications had already been disclosed during voir dire, and that the juror would be barred from testifying about their effect on deliberations by Federal Rule of Evidence 606(b) (limiting juror testimony about extraneous influences to "whether extraneous prejudicial information was improperly brought to the juror's attention" or "whether any outside influence was improperly brought to bear upon any juror"). The District Court did not abuse its discretion in rejecting Gabrion's request for a *Remmer* hearing.

### XX.  Alleged Brady Violation Concerning Competency Challenge to Government Witness

Gabrion contends that the District Court erred in rejecting his motion for a new trial on the basis of newly discovered evidence, or, in the alternative, a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The relevant evidence — the discovery of which Gabrion argues should grant him a new trial — is the fact that Lloyd Westcomb, a Government witness, submitted to a competency evaluation in a state court proceeding related to a criminal charge against him pending during Gabrion's trial.  Because the fact of the competency evaluation was plainly not material in light of the information disclosed by Westcomb during his testimony, we reject Gabrion's argument.

This Circuit employs a four-part test in deciding whether newly discovered evidence merits a new trial: (1) the new evidence must be discovered after trial, (2) the evidence could not have been discovered earlier with due diligence, (3) the evidence must be material and not merely cumulative or impeaching, and (4) the evidence would likely produce an acquittal if the case were retried.  *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982).  There are plausible arguments that this evidence fails all four prongs of the *Barlow* test, but materiality is the point at which its failure is most obvious.  During his testimony, Westcomb disclosed both the pending charge against him, and the fact that he had been diagnosed as a paranoid schizophrenic.  Even assuming that the fact of his submitting to a competency evaluation pursuant to that charge would have been admissible impeachment evidence (the District Court did not think it was), it is difficult to see what added, as opposed to cumulative, value it would have presented as impeachment in light of these two disclosures.  Gabrion's alternative *Brady* argument fails for the same reason.  Impeachment evidence purportedly withheld in violation of *Brady* must meet a materiality threshold to merit the granting of a new trial.  *United States v. Bagley*, 473 U.S. 667, 682 (1985) (defining materiality as evidence the non-disclosure of which is "sufficient to undermine confidence in the outcome").  Given the evidence's cumulative nature (not to mention the significant other evidence supporting the jury's verdict in this case), we have no difficulty accepting the District Court's

conclusion that there was nothing about Westcomb's competency evaluation that would undermine confidence in the jury's verdict.

## XXI.  Jury Instructions in the Penalty Phase

The standard of review for jury instructions is whether, viewed as a whole, they fairly and adequately submit the issues and applicable law to the jury.  A District Court's refusal to deliver a requested instruction is reversible error only if the proposed instruction is (1) a correct statement of the law, (2) not substantially covered by an actual jury charge, and (3) so important that failure to give it substantially impairs the defendant's defense.  *United States v. Blanchard*, 618 F.3d 562, 573 (6th Cir. 2010).  Gabrion argues that the District Court erred in failing to give the following requested instructions: (1) that his courtroom behavior during the sentencing phase of the trial could serve as a separate mitigating factor, and (2) that the Bureau of Prisons had the power to restrict Gabrion's interaction with and communication with individuals both inside and outside the prison, thereby mitigating the government's argument that Gabrion's future dangerousness weighed in favor of the death penalty instead of life imprisonment.

## A.  Refusal to Instruct Jury about Gabrion's Courtroom Behavior

Gabrion contends that the District Court erred when it refused to instruct the jury during the penalty phase that it could consider Gabrion's courtroom behavior as an indication of his inability to control his conduct and therefore serve as a separate mitigating factor to be weighed against the aggravating factors.[18]  Gabrion also argues that the refusal to give such an instruction served as an "explicit or implicit" bar on addressing the issue in closing arguments.

To the extent that Gabrion's courtroom behavior served as some type of mitigating factor, it was adequately covered when the District Court related the

---

[18] The requested instruction was that, "Marvin Gabrion's in-court behavior is an indication of his inability to control his conduct." (Proposed Instructions at 7, J.A. at 652).

mitigating factors to the jury, including that defendant suffers from "severe personality disorders," "traumatic brain injuries which have led to neurological impairments," and "brain dysfunction which has impaired his ability to control his conduct . . . ." J.A. at 2025. Gabrion's courtroom behavior was not a mitigating factor separate from those listed above, and the District Court was correct to not give the proposed instruction. And, in addition, the jury was instructed that they could consider "anything else" that would mitigate against the imposition of the death penalty, even if not specifically mentioned by the defense. J.A. at 2025-26.

Nor did the failure to give the requested instruction impair or foreclose any arguments by defense counsel during closing or otherwise. Defense counsel did argue on many occasions during the penalty phase that Gabrion's mental problems, brain injuries, and the resulting inability to control himself mitigated his sentence. The fact that the jury did not receive a specific instruction about Gabrion's courtroom behavior in no way precluded the jury from considering it along with the other mitigating evidence they heard.

**B.  Instruction Concerning Bureau of Prisons' Regulations**

Gabrion contends that the District Court erred when it failed to give a requested instruction regarding Bureau of Prisons' regulations regarding dangerous inmates and the administrative regulations available to it to control Gabrion. By requesting this instruction, Gabrion wanted to show the jury that he could be securely held in prison despite the government's argument that his future dangerousness was so severe that he should be executed because it would be difficult to keep inmates, female prison guards, and others on the prison staff safe from Gabrion, as well as difficult to prevent him from sending threatening communications to persons outside the prison. Gabrion argues that the instruction is necessary because the government objected to testimony by one of Gabrion's witnesses in the penalty phase, Mark Cunningham, concerning Bureau of Prisons' regulations and how the Bureau controls inmates considered to be a risk to the safety of other inmates and prison staff. Despite the objection, however, Cunningham

was allowed to testify as to the different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous.

Gabrion's defense was not impaired by the refusal to give this instruction. First, the District Court gave the jury an instruction that encompassed Gabrion's concerns when it instructed the jury that it could consider as one of the mitigating factors the fact that "the defendant will not be a danger in the future if he is confined in a highly structured and secure federal prison." (J.A. at 2025). Second, Gabrion elicited testimony from Cunningham outlining the restrictions available to the Bureau of Prisons to secure a dangerous inmate. Had the District Court given this instruction, it is likely that the government would have requested a countervailing instruction telling the jury that no prison is totally secure and confinement in a maximum security federal prison is not a guarantee that Gabrion will never threaten or harm anyone in the future. By allowing Cunningham to testify and by instructing the jury that they could consider as a mitigating factor that Gabrion would not be a danger if housed in a secure federal prison, Gabrion's concerns were addressed, and the District Court did not abuse its discretion in declining to give the requested instruction.

Accordingly, the jury verdict at the guilt phase of the trial is affirmed and the verdict of death at the sentencing phase is reversed. The case is remanded to the District Court for a new trial on the sentencing phase of the case pursuant to 18 U.S.C. § 3595.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

ALICE M. BATCHELDER, Chief Judge, concurring in part and dissenting in part.  I would affirm the district court in its entirety — both conviction and sentence.  Therefore, I concur generally in the portions of the majority's decision that affirm the judgment of the district court without necessarily joining the majority's reasoning or discussion.  I agree that we need not reach the issue contained in Section XIV but I do not join in the associated dicta.  I respectfully dissent from those portions of the majority's decision that reverse the district court, specifically Sections II and III.

In Section II, the majority conducts a *de novo* review[1] of Gabrion's claim that the district court misinterpreted or misapplied certain provisions of the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. §§ 3591 - 3598.  By reading the word "any" in § 3592(a) ("any mitigating factor") and § 3593(c) ("any information relevant to a mitigating factor") as unqualified and unlimited, the majority holds that these provisions mandate that a capital defendant may offer to the jury any "mitigating" evidence or argument, i.e., any evidence or argument that could conceivably make a juror question the appropriateness of the death penalty.  Reading "any" as unlimited necessarily requires the inclusion within these two provisions of Michigan's policy against the death penalty.  The majority therefore concludes that the district court erred by excluding reference to Michigan law.

In Section III, the majority considers Gabrion's claim that the district court violated his constitutional right to due process by misinstructing the jury on the burden of proof in the weighing of aggravating and mitigating factors, and again conducts a *de*

---

[1] Absent the statutory claim, we would review a challenge to the district court's exclusion of evidence for an abuse of discretion.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. Lujan*, 603 F.3d 850, 853 (10th Cir. 2010) ("We review a district court's order excluding evidence from the penalty phase of a capital case under 18 U.S.C. § 3593(c) for an abuse of discretion."); *United States v. Pepin*, 514 F.3d 193, 202 (2d Cir. 2008).

*novo* review.**2**   The district court instructed the jury that it need only find that the aggravating factors "sufficiently outweigh" the mitigating factors, which is language quoted directly from the statute.  *See* § 3593(e).  The majority finds the statutory language unacceptably vague, and therefore constitutionally infirm, and holds that a sentencing court must instruct the penalty-phase jury that it may impose the death penalty only if it finds *beyond a reasonable doubt* that the aggravating factors outweigh the mitigating factors.

I must respectfully disagree with both of these holdings.  I would hold that a reasonable reading of §§ 3592(a) and 3593(c) allows a sentencing court to impose some limits on the evidence or argument the defendant may offer in mitigation, and that the district court properly did so in this case.  Similarly, I would hold that the Constitution does not dictate the manner in which death-penalty aggravating and mitigating factors are to be weighed, and therefore the district court could not and did not violate the Constitution in the way it instructed the jury.  I would affirm the district court.

**I.**

Prior to the sentencing phase, the government moved the district court *in limine* to prohibit Gabrion's counsel from arguing, as a mitigating factor, that the Michigan state constitution prohibits the death penalty.  *See* Mich. Const. Art. IV, § 46 ("No law shall be enacted providing for the death penalty.").  Gabrion's counsel conceded that Michigan's prohibition, taken alone, would not be a direct mitigating factor, and explained that he actually intended to argue that the imposition of the death penalty in this case would be arbitrary, given the totality of the circumstances:

> [I]n this case there is the potential for argument that it would be arbitrary, potentially arbitrary for this Michigan case with a Michigan victim, a Michigan defendant, in this somewhat accidental finding of the body on

---

**2**Absent a claim of constitutional violation, we would review a challenge to the district court's jury instructions for an abuse of discretion.  *United States v. Svoboda*, 633 F.3d 479, 483 (6th Cir. 2011); *see also Boyle v. United States*, 556 U.S. --, 129 S. Ct. 2237, 2244 (2009) ("A trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed.").

federal property, it's an argument that we may like to make [to the jury] to say this [death penalty] is an arbitrary decision. The location of the body is somewhat happenstance and could be a factor that [the sentencing jury] could consider. Were this body found 200 feet [in] the other direction, this [case] would be in Michigan [court] and there would be no death penalty possible. It's an arbitrary factor that we feel we should be permitted to argue.

The government replied, *inter alia*, that this was an inappropriate political argument and "an invitation for this jury to cast aside what federal law provides for." The district court granted the motion and barred the argument, holding that it was not a mitigating factor under § 3592(a):

> The mitigating factors as set forth in 3592(a) of 18 United States Code talks about specific ones: the participation in the crime, the impairment of capacity, duress, et cetera, et cetera; equally culpable defendants, which is what someone said here a little while ago; and victim's consent. And then it says: 'Any other factor in the defendant's background, record[,] or character[,] or any other circumstances of the offense that mitigate against imposition of [a] death sentence.'

> Now, the jury has found beyond a reasonable doubt, and had to find because that was one of the four essential elements of the particular offense that was before the jury last week concerning guilt, has found beyond a reasonable doubt that the crime occurred within federal territory or on federal property. This cannot be relitigated. It's already been litigated. It's not a specific factor that can be litigated, and to make mention of it would be relitigating it saying, Well, look, if it happened two, three hundred feet away, it wouldn't be.

> This issue, of course, presents itself in a multitude of circumstances before this [c]ourt. In virtually every one[,] this [c]ourt and the [c]ourt of [a]ppeals has given clear markings that it's not a subject to be discussed. For instance, there are certain drug violations, particularly as pertains to crack cocaine, where there are some rather heavy sentences for crack cocaine distributors [under federal law] compared with, say, Michigan law. And this [c]ourt would never permit nor could this [c]ourt [] by law permit a defense counsel to get up and say [to the jury], You know, under state law this has a penalty of X and Y, but here we are in federal court and it has a much higher penalty, so therefore, you ought to do this, jury.

> This isn't for — that isn't material to the case. That isn't material to the defendant's background, record[,] or character. That isn't material to the circumstances of the case, nor does it mitigate one way or the other, and it is not a proper subject matter. It would in fact permit the jury to speculate and it would in fact insert an extraneous matter into the process.

Thus, the district court "preclud[ed] defense argument concerning the lack of a death penalty under the law of the State of Michigan as mitigating factor."

At the close of evidence and argument, the district court instructed the jury to consider 12 specific mitigating factors and "anything else about the commission of the crime or about Marvin Gabrion's background or character that would mitigate against the imposition of the death penalty . . . whether or not specifically argued by defense counsel, but which are supported by the evidence." After almost seven hours of deliberation, the jury imposed the death penalty.

On appeal, Gabrion claims a violation of both a constitutional[3] and a statutory[4] right to present mitigating evidence and argument to the sentencing jury — on theories

---

[3]*See* Appellant Br. at 118 (Dec. 12, 2005) (Assigned Error 28: "The failure to allow the jury to consider as a mitigating circumstance the fact that Michigan is not a death penalty jurisdiction when there remained residual doubt about federal jurisdiction violated the Eighth Amendment."); Appellant Reply Br. at 42 (Dec. 12, 2005) (Assigned Error 28: "The district court violated the Eighth Amendment by not allowing the jury to consider the fact that Michigan is not a death penalty jurisdiction when an arbitrary 227 feet was all that made this a capital prosecution."); Supp. Appellant Br. at 45 (Dec. 14, 2009) (Supplemental Argument 10: "Failure to allow the jury to consider as a mitigating circumstance that fact that Michigan is not a death penalty jurisdiction was reversible [constitutional] error.").

[4]*See* Appellant Br. at 120 (Dec. 12, 2005) ("This [absence of the death penalty under Michigan law] clearly was a fact that the jury under 18 U.S.C. § 3592(a)(8) and *Lockett* should have been allowed to consider."); Appellant Reply Br. at 42-43 (Dec. 12, 2005) ("This is an important factor related to this crime and a 'circumstance of the offense, and, as such, pursuant to the 'catch-all' provision of 18 U.S.C. § 3592(a)(8), the jury should have been instructed to consider the fact that Michigan is not a death penalty jurisdiction."); Supp. Appellant Reply Br. at 28-29 (Mar. 22, 2010) (Supplemental Reply Argument 7: "Michigan as a non-death state," reiterating that "[t]his is an important factor related to this crime and a 'circumstance of the offense, and, as such, pursuant to the 'catch-all' provision of 18 U.S.C. § 3592(a)(8), the jury should have been instructed to consider the fact that Michigan is not a death penalty jurisdiction.").

of residual doubt,[5] arbitrariness,[6] and disproportionality to the sentences meted out for other equally culpable defendants.[7] There is no need to dwell on the constitutional claim, as it is untenable.[8] The majority does not even address it and therefore, presumably, rejects it by implication. But the majority does accept the statutory claim.

---

[5]*See* Appellant Br. at 118-19 (Dec. 12, 2005) (alleging a "lingering doubt as to whether the offense was committed within the exclusive maritime and territorial jurisdiction of the United States"); Appellant Reply Br. at 42 (Dec. 12, 2005) (asserting that "there remained residual doubt about federal jurisdiction"); Supp. Appellant Br. at 45 (Dec. 14, 2009) (asserting that "there remained residual doubt about federal jurisdiction").

[6]*See* Appellant Br. at 119 (Dec. 12, 2005) (alleging that "an arbitrary 227 feet made the difference between life and death" based on a "geographical happenstance that had this offense occurred outside the exclusive maritime and territorial jurisdiction of the United States [and therefore in Michigan jurisdiction], no death penalty could be imposed under the constitution of the State of Michigan"); Appellant Reply Br. at 43 (Dec. 12, 2005) (arguing that "had the body been discovered 228 feet north of where it was[,] execution would not have been a penalty [that] jurors could have considered [so] [t]his is the ultimate 'arbitrary' factor barring the death penalty under federal law").

[7]*See* Appellant Br. at 120 (Dec. 12, 2005) (referring in a parenthetical to a case concerning "equally or more culpable defendants [who] would not face the death penalty").

[8]In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), a plurality of the Court announced that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, [1] any aspect of a defendant's character or record and [2] any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The *Lockett* plurality reiterated: "Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12. The Court adopted this statement as a holding in *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *accord Kordenbrock v. Scroggy*, 919 F.2d 1091, 1102 (6th Cir. 1990) (en banc).

The fact that Michigan law does not allow for the death penalty is not an aspect of Gabrion's character or personal record, nor is it a circumstance of the offense (i.e., the planning and murdering of Rachel Timmerman and her daughter). Gabrion argues that he has a constitutional right to present mitigating evidence and argument to the sentencing jury on theories of residual doubt about federal jurisdiction, arbitrariness due to the location of the body, and disproportionality to other equally culpable defendants. But these arguments lack constitutional bases.

In *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988), a plurality of the Court said: "Our edict [in *Lockett* and *Eddings*] in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's 'character,' 'record,' or a 'circumstance of the offense.'" This reasoning is even more compelling when applied to residual doubt about jurisdiction.

In *Oregon v. Guzek*, 546 U.S. 517, 526 (2006), the Court considered (and rejected) the "residual doubt" theory in a different way and its reasoning can be applied to the arbitrariness argument that Gabrion proposes here. To analogize *Guzek*: Sentencing traditionally concerns how, not where, the defendant committed the crime, but the evidence and argument at issue here — the location of the body — concern only where, not how, he did so. The jury decided this issue — *where* Gabrion committed the crime — during the guilt phase. This evidence and argument would thereby attack a previously determined matter and the law typically discourages collateral attacks of this kind. *See id.*

In *Pulley v. Harris*, 465 U.S. 37, 50 (1984), the Court held that comparative proportionality review is not constitutionally required. "Any capital sentencing scheme may occasionally produce aberrational outcomes." *Id.* at 54.

The majority finds that the district court erred by "fail[ing] to consider the specific language of the statute allowing 'any mitigating factor,'" in the FDPA, §§ 3592(a) and 3593(c), and relies on *United States v. Davis*, 132 F. Supp. 2d 455 (E.D. La. 2001), for the proposition that the phrase "any mitigating factor" contains "no qualification or limitation," and therefore the defendant is entitled to present or argue "any mitigating factor . . . period." *Id.* at 464 (ellipses in original; internal quotation marks omitted). The majority then defines mitigating factors as anything that "could conceivably make a juror question" the appropriateness of imposing the death penalty in a given case. By this reading of "any" and "mitigating", the majority concludes that "[t]he phrase 'any mitigating factor' plainly includes information about Michigan's policy against the death penalty."

But such a broad view is not universally held. At least one member of the Supreme Court would reject this view. *See Graham v. Collins*, 506 U.S. 461, 490 (1993) (Thomas, J., concurring) ("By requiring that sentencers be allowed to 'consider' all 'relevant' mitigating circumstances, we cannot mean . . . that circumstances are necessarily relevant for constitutional purposes if they have any conceivable mitigating value."). We appear to have rejected such a broad view in this Circuit as well. In *Owens v. Guida*, 549 F.3d 399, 419-20 (6th Cir. 2008), we rejected the defendant's contention that the proposed mitigating evidence[9] was "automatically relevant" and admissible simply because she "wishe[d] to present" it. The *Owens* dissent argued that because the evidence could have persuaded the jury to spare the defendant's life, it clearly "fall[s] within the meaning of 'any relevant mitigating evidence,'" *id.* at 431 (Merritt, J., dissenting), but the majority expressly rejected that argument, *id.* at 422. The Seventh Circuit has also rejected such a broad view. "A mitigating factor is a factor arguing against sentencing *this* defendant to death; it is not an argument against the death penalty

---

[9]Owens sought to admit evidence in mitigation that the prosecutor had offered her a conditional plea agreement for a life sentence (later withdrawn), and that she had offered to plead guilty. *Owens*, 549 F.3d at 403.

in general." *United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2000).[10] "This is apparent from the fact that the list of mitigating factors in the [FDPA] does not include the harshness or ugliness or (some would say) the immorality of the death penalty, but only factors specific to the defendant. *See* 18 U.S.C. § 3592(a), and in particular subsection (a)(8) . . . ." *Id.*

The counter-argument, which stems from *Davis* as well, is that the FDPA is "substantially broader than what the Supreme Court has declared to be the minimal requirements under the Constitution." *Davis*, 132 F. Supp. 2d at 464. That is, by using the phrase "including the following" in § 3592(a), Congress made the list illustrative not exclusive, and included the Supreme Court's constitutional minimum (codified as subsection § 3592(a)(8) in the non-exclusive list) as merely one sub-category of "any mitigating factor," of which there are others yet unarticulated. *Id.* This view renders *Graham* and *Owens* inapposite, inasmuch as both were predicated on *Lockett* and *Eddings* (i.e., the constitutional minimum), and directly refutes the reasoning of *Johnson*.

There are certainly courts that subscribe to this "broad view" of admissibility (i.e., the *Davis* view) — at least five district courts at last count.[11] But there are also courts that do not. The most thorough critique of *Davis*'s broad view is presented in *United States v. Taylor*, 583 F. Supp. 2d 923, 933 (E.D. Tenn. 2008), an FDPA case in which the defendant sought to admit evidence about other federal capital cases in which other murderers were not sentenced to death, in an effort to persuade the sentencing jury

---

[10]*Accord Schmitt v. Kelly*, 189 F. App'x 257, 264 n.5 (4th Cir. 2006) (quoting *Johnson*); *United States v. Caro*, 483 F. Supp. 2d 513, 520 (W.D. Va. 2007); *United States v. Edelin*, 180 F. Supp. 2d 73, 76 (D.D.C. 2001).

[11]*See*, *e.g.*, *United States v. Moonda*, No. 1:06-cr-00395, 2007 WL 2071924 at *1 (N.D. Ohio July 13, 2007); *United States v. Bodkins*, No. 4:04-cr-70083, 2005 WL 1118158 at *8-9 (W.D. Va. May 11, 2005); *United States v. Honken*, 378 F. Supp. 2d 1040, 1041 (N.D. Iowa 2004); *United States v. Sampson*, 335 F. Supp. 2d 166, 193-98 (D. Mass. 2004) (adopting the broad view of admissibility, but nonetheless excluding the proffered evidence because it would mislead jury and confuse the issues); *United States v. Bin Laden*, 156 F. Supp. 2d 359, 370 (S.D.N.Y. 2001).

that sentencing him to death would be disproportionate by comparison.[12] The defendant "argue[d] [that] the FDPA is broader than the Constitution in its consideration of mitigating factors," *id*. at 934, and the district court acknowledged that other district courts had accepted that broad view of admissibility, *id*. (quoting at length *United States v. Sampson*, 335 F. Supp. 2d 166, 194-95 (D. Mass. 2004) (quoting *Davis*, 132 F. Supp. 2d at 463-64)). But the district court in *Taylor* also recognized that "the Seventh Circuit [has] construed the statute more narrowly," *id*. (citing *Johnson*, 223 F.3d at 675), and proceeded to "engage in statutory construction," *id*.:

> Applying the traditional tools of statutory construction, the [c]ourt concludes the Seventh Circuit's interpretation is more persuasive. The [c]ourt begins by considering the language of the statute as a whole. One provision of a statute is not considered in isolation or in a vacuum. Rather, courts must consider a statutory provision's phraseology in light of the overall structure and purpose of the legislation. Thus, the [c]ourt must make every effort to interpret provisions so that other provisions in the statute are not rendered inconsistent, superfluous, or meaningless.

> *First*, the statutory construction canon *ejusdem generis* applies here: 'Where a statute lists specific things followed by a more general one, the canon of *ejusdem generis* provides guidance. Under *ejusdem generis*, we attribute the same characteristic of discreteness shared by all the preceding items to the term in question.' Applying this canon shows that the first seven factors are similar to the eighth factor. Although the list of seven specific factors is illustrative, not exhaustive, the description of 'Other factors' does not allow for factors of an entirely different nature from the illustrated factors. All the illustrated factors concern the defendant or the circumstances of the offense, including the culpability, participation, and punishment of other defendants. Applying *ejusdem generis*, it is evident that the characteristics of the enumerated mitigating factors are similar to the description of 'Other factors' as those concerning a defendant's background, record, or character[,] or any other circumstance of the offense that mitigate against imposition of the death sentence.

---

[12]The specific evidence that the defendant sought to admit was "the testimony of Kevin McNally regarding the dispositions of other potential capital cases and how they compare to the instant case." *Taylor*, 583 F. Supp. 2d at 927. McNally is an attorney with the Federal Death Penalty Resource Counsel Project. *Id*. at 927 n.2. McNally is also appellant Gabrion's present counsel of record in this case and the signatory on the briefs submitted in this appeal.

*Second*, Defendant's reading of the statute would render the inclusion of 'Other factors' superfluous.  'Other factors' is a catch-all provision.  If the statute permitted other factors beyond what is contained in 'Other factors,' the statute would contain a broader description than what is contained in 'Other factors.'  Under Defendant's reading, the statute contains an implied 'other factors' in addition to the 'Other factors' actually listed, thus rendering 'Other factors' superfluous.

*Third*, the [c]ourt finds misplaced the emphasis on the word 'any' in 'any mitigating factors.'  Contrary to Defendant's assertion, the FDPA's use of the word 'any' does not indicate [that] Congress intended to greatly expand the definition of mitigating factors over that required by the Constitution.  The statutory language of 'any mitigating factor,' 18 U.S.C. § 3592(a), is the same as the Constitutional requirement of 'any relevant mitigating factor' [in *Lockett* and *Eddings*].  The FDPA's exclusion of the word 'relevant' has no bearing because elsewhere the statute makes clear non-relevant information is inadmissible. 18 U.S.C. § 3593(c).

Based on these considerations, the [c]ourt concludes [that] the mitigating factors required by the FDPA are not as broad as Defendant contends, but are rather in line with the seven enumerated factors and the description of 'Other factors' contained in the statute.

*Id*. at 934-35 (citations and quotation marks omitted).  The *Taylor* district court therefore concluded that "such testimony [wa]s inadmissible and is not proper for presenting to a jury."[13]  *Id*. at 933.

Circuit courts have rejected *Davis*'s broad view as well.  In *United States v. Sampson*, 486 F.3d 13, 44-45 (1st Cir. 2007), the defendant sought to admit evidence "that numerous other federal defendants convicted of multiple murders had not been sentenced to death"[14] and argued that the "trial court may not restrict the presentation of relevant evidence offered in mitigation of a possible death sentence" (i.e., the broad view).  The First Circuit disagreed, saying: "This argument cannot be literally true; if it were, a capital defendant would have an unrestricted license to introduce the most

---

[13] This case is presently pending on appeal in the Sixth Circuit as *United States v. Taylor*, No. 09-5517.

[14] This is the same evidence — i.e., testimony by Kevin McNally — that the defendant sought to introduce in *Taylor*, 583 F. Supp. 2d at 933, discussed *supra* note 12.

confusing or misleading evidence as long as it was marginally relevant.  We reject so absolutist a view." *Id*. at 45; *accord United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005) ("The [FDPA] erects very low barriers to the admission of evidence at capital sentencing hearings . . . [b]ut this does not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes."); *see also United States v. Mitchell*, 502 F.3d 931, 991 (9th Cir. 2007) (limiting relevant mitigating evidence to "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value" (quotation marks omitted)).

In *United States v. Caro*, 597 F.3d 608, 634-35 (4th Cir. 2010), the defendant sought to admit  "a letter he had written to the government offering to plead guilty" but the district court excluded the letter as irrelevant.  Caro argued that "the letter was admissible under § 3593(c) because it supported the mitigating factor of acceptance of responsibility," but the Fourth Circuit rejected this argument and held that the district court had not abused its discretion by excluding it.  *Id*. at 635.

In the district court, Caro had sought a jury instruction on "residual doubt" as a mitigating factor and cited *Davis*, 132 F. Supp. 2d at 467-68, for authority.  *United States v. Caro*, 483 F. Supp. 2d 513, 518 n.7 (W.D. Va. 2007).  The *Caro* district court expressly rejected this argument:

> Under the system envisioned by the *Davis* court, therefore, a capital defendant is found guilty twice: first in the guilt phase and then if the defendant desires, the jury can revisit his guilt in the sentencing phase. The Supreme Court has never required this two-stage guilt determination and Congress did not so provide in the FDPA.  Hence, the *Davis* argument lacks sufficient support.

*Id*.  The court went on to explain:

> Because the [Supreme] Court has never found that a defendant has a constitutional right to a residual doubt instruction, any entitlement to this instruction must come from the applicable capital statute.  The FDPA provides that 'in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor.'  18 U.S.C.A. § 3592(a).  The statute then lists seven mitigating

factors. While it is true that this list is not meant to be exhaustive, the absence of residual doubt as a statutory mitigating factor is instructive. The government argued that Congress at the time the FDPA was enacted, was aware of the holding in *Franklin* that residual doubt is not a constitutionally required mitigating circumstance and, had it elected to do so, could have included language in the statute expressly authorizing the consideration of residual doubt.

*Id.* at 519-20 (certain citations, editorial marks, and quotation marks omitted).

Therefore, the district court in *Caro* concluded, "the words of the FDPA suggest[] that residual doubt is not a proper mitigating factor." *Id.* at 520. Caro also sought a jury instruction on "life without the possibility of parole" as a mitigating factor and the district court rejected that as well, quoting *Johnson*, 223 F.3d at 675 ("A mitigating factor is a factor arguing against sentencing *this* defendant to death; it is not an argument against the death penalty in general."), concluding that "this factor is wholly irrelevant to these considerations." *Id.* Caro did not appeal these issues.

The case most closely analogous case to Gabrion's is *United States v. Higgs*, 353 F.3d 281, 289 (4th Cir. 2003), which concerned the kidnapping and murder of three women in the Patuxent National Wildlife Refuge, located in Prince George's County, Maryland. Higgs and his accomplice enticed the women to this secluded location with the premeditated purpose of murdering them. *Id.* at 290. Higgs drove the women in his car, supplied the murder weapon, and orchestrated the murder, but his accomplice actually shot and killed them while Higgs waited in the car. *Id.* Although located in Maryland, the Patuxent National Wildlife Refuge is federal property under federal jurisdiction, *id.*, so the federal prosecutor charged Higgs under federal statute, tried the case in federal court, and sought the death penalty, *id.* at 294. The jury returned guilty verdicts on all charges. *Id.*

At sentencing, Higgs's counsel sought to argue "to the jury, as a mitigating circumstance, that Higgs would not have been eligible for the death penalty if the murders had occurred within the jurisdiction of the State of Maryland" because, "under Maryland law, the death penalty may only be imposed on the 'triggerman' in cases such

as this," *id*. at 328 — suggesting that a death sentence would be disproportionate to the sentences of other similarly situated defendants in Maryland. Higgs's counsel also sought to argue that "because the murders took place in an area where Maryland had an easement over federal property, [Higgs] could not have known that he was on federal land when he committed the murders," *id*. — suggesting residual doubt or that imposition of the death penalty would be arbitrary under the circumstances.[15] The district court excluded this evidence and associated argument. *Id*. On appeal, the Fourth Circuit affirmed, explaining:

> Section 3592(a) provides that 'in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor.' In addition to seven enumerated factors, the statute requires consideration of 'other factors in the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence.' Higgs asserts that his unknowing presence within federal jurisdiction, as opposed to the jurisdiction of the State of Maryland where he would have been ineligible for a death sentence, is a circumstance of the offense that mitigates against imposition of the death sentence. We disagree.
>
> . . .
>
> An assertion that the death penalty is improper in one jurisdiction because it is not allowed in another is, at bottom, a reflection of the debate surrounding the propriety of the death penalty, which is a matter of policy for the legislative branch. As such, it was not error to refuse to submit it as a mitigating factor in this case.

*Id*. (citations and editorial marks omitted).

Higgs committed a murder on federal property in Maryland. Gabrion committed a murder on federal property in Michigan. Higgs would not have been subject to the death penalty under Maryland law. Gabrion would not have been subject to the death penalty under Michigan law. Both sought to argue this disparity to their respective

---

[15] This was, in fact, his specific argument to the Fourth Circuit. *See* Brief of Appellant, *United States v. Higgs*, No. 01-3, 2002 WL 33958104 at 143 (4th Cir. Aug. 21, 2002) ("The fact that these murders occurred on a state easement over federal property as opposed to property owned by the state of Maryland and under Maryland's jurisdiction is a circumstance of the offense and a totally arbitrary factor that exposed Higgs to the death penalty.").

sentencing juries and both district courts refused to permit the argument. It is not easy to distinguish the two cases — or the two defendants' arguments. Both suggest residual doubt, arbitrariness, and disproportionality based on the disparity between state and federal law.

The Fourth Circuit held that Maryland law was not a circumstance of the offense or even a mitigating factor. *Higgs*, 353 F.3d at 328; *cf. Taylor*, 583 F. Supp. 2d at 943 ("France's policy on capital punishment does not make [a capital] [d]efendant [in the United States] more or less deserving of a death sentencing."). This same analysis is appropriate in the present case.

Gabrion's counsel sought to argue to the jury, as a mitigating circumstance, that Gabrion would not have been eligible for the death penalty if the murder had occurred 228 feet to the north, i.e., within the jurisdiction of the State of Michigan, because Michigan does not have the death penalty. The majority holds that the FDPA, §§ 3592(a) and 3593(c), required the district court to admit this evidence and argument without limitation, and relies on the "broad view" (i.e., the *Davis* view) of admissibility. But, as the foregoing discussion demonstrates, it appears that the greater weight of authority is against *Davis*'s broad view. And I note additional obstacles.

The inflexibility of such an absolute proposition appears to render it limitless.[16] After today, Michigan's law against the death penalty is a mitigating factor. But suppose Michigan had, not a law, but merely pending legislation to abolish the death penalty — must a court admit that as a mitigating factor? What about a pending Supreme Court case or a campaign promise? The Pope condemns the death penalty — is that a mitigating factor to be argued to the sentencing jury? Read generously, this broad view of admissibility entitles a capital defendant's counsel to present evidence or argument no matter how tenuous, tangential, or even speculative. The only limit is counsel's own

---

[16]In fact, § 3593(c) contains a stated limitation: "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." But this limitation does not fit — nor is it anywhere to be found in — the *Davis* view or the majority's rendition of it.

creativity — or lack of creativity. And if counsel may present such argument, no matter how ineffective or unappealing to jurors, will there come a day when we hold counsel ineffective for failing to do so?

Furthermore, this particular argument — about Michigan law — appears to be an endorsement of jury nullification of federal law.[17] *Cf. Hall v. Washington*, 106 F.3d 742, 750 (7th Cir. 1997); *New Mexico v. Clark*, 990 P.2d 793, 806 (N.M. 1999). We have held that courts are not to endorse jury nullification. *See*, *e.g.*, *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988) ("A jury's 'right' to reach any verdict it wishes does not, however, infringe on the duty of the court to instruct the jury only as to the correct law applicable to the particular case."); *see also United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1992). In fact, "it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence." *Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir. 2005) (citing *Sparf v. United States*, 156 U.S. 51, 102 (1895)); *accord United States v. Avery*, 717 F.2d 1020, 1027 (6th Cir. 1983). Gabrion's counsel would urge the jurors to disregard federal law in favor of Michigan law and decline to impose the death penalty because it would be unavailable under Michigan law. The majority holds that the court must allow this. And yet, if a juror at voir dire expressed this intention, the prosecution could have that juror removed for cause. *See Wainwright v. Witt*, 469 U.S. 412, 426 (1985) (jurors may be removed for cause at the voir dire stage of a capital trial if they express an inability or unwillingness "to faithfully and impartially apply the law").

---

[17]There are those who hold a different view of the argument that deference must be given to local policy preferences and "contemporary community values." *See*, *e.g.*, John Brigham, Unusual Punishment: The Federal Death Penalty in the United States, 16 Wash. U.J.L. & Pol'y 195, 214 (2004) (praising "the authority of the United States to apply its criminal law in the face of local opposition as a matter of principle, else we would have no federal civil rights law" (quotation marks omitted)); Rory K. Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role, 26 Fordham Urb. L.J. 347, 475 (1999) (recognizing "the past courageous role of some U.S. Attorneys in enforcing federal civil rights laws in the face of local antipathy"); *United States v. Fell*, 571 F.3d 264, 270 (2d Cir. 2009) (Raggi, J., concurring in the denial of *en banc* rehearing) (arguing that this proposition would "be rejected out of hand if the [issue] were opposition to the sorts of civil rights, environmental, or gun trafficking requirements that are enforced through federal criminal law in ways not always mirrored in state legislation").

Finally, this approach will create an inconsistency in the application of the FDPA when Congress's intent was to ensure uniformity. *See* Rory K. Little, The Federal Death Penalty:  History and Some Thoughts About the Department of Justice's Role, 26 Fordham Urb. L.J. 347, 434 (1999) ("While one might possibly argue in favor of a federal death penalty regime that lacks national uniformity — one that would permit similar federal crimes and defendants to receive life or death dependant on the district and regionalized, cultural differences — that does not appear to be the statute Congress has enacted nor is it the stated policy of the Attorney General."); *see also United States v. Acosta-Martinez*, 252 F.3d 13, 20 (1st Cir. 2001) ("There is little reason to think that the federal interest in defining the punishment for federal crimes would have been considered by Congress to be a matter for local veto power.").  If Congress had intended to treat the non-death-penalty jurisdictions[18] differently under the FDPA, it certainly could have done so.  But it did not.

For the foregoing reasons, I cannot join the majority's adoption of the *Davis* broad view of admissibility.  I would read § 3592(a) and § 3593(c) as having the same limits as the *Lockett* and *Eddings* line of cases. *See United States v. Rodriguez*, 581 F.3d 775, 815 (8th Cir. 2009) ("The Justices' reasons for declining to recognize a constitutional rule apply with equal force [to] the FDPA.").  I would hold that these provisions allow a sentencing court to limit the evidence or argument to be offered in mitigation, and that the district court properly did so in this case.

---

[18]There are currently 18 jurisdictions without the death penalty:  Alaska, Hawaii, Illinois, Iowa, Maine, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Dakota, Rhode Island, Vermont, West Virginia, Wisconsin, Puerto Rico, and the District of Columbia.  At last count, there were eight federal death-row inmates from these non-death-penalty jurisdictions:  Carlos Caro (West Virginia), Donald Fell (Vermont), Marvin Gabrion (Michigan), Dustin Honken (Iowa), Angela Johnson (Iowa), Ronald Mikos (Illinois), Alfonso Rodriguez (North Dakota), and Gary Sampson (Massachusetts). *See* http://www.deathpenaltyinfo.org/federal-death-row-prisoners.

## II.

At sentencing, Gabrion asked for a jury instruction concerning the weighing of aggravating and mitigating factors, which would have required the jury "to decide whether you are unanimously persuaded *beyond a reasonable doubt* that the aggravating factors proved so outweigh any mitigating factors that justice cannot be served absent a sentence of death." The court declined and instead instructed the jury that it need only find that the aggravating factors "sufficiently outweigh" the mitigating factors, which is language quoted directly from the statute. *See* § 3593(e).

On appeal, Gabrion claims that this instruction denied him due process, in violation of the Fifth and Eighth Amendments to the Constitution. The majority agrees and holds that a sentencing court must instruct the penalty-phase jury that it may not impose the death penalty unless it finds *beyond a reasonable doubt* that the aggravating factors outweigh the mitigating factors. The majority recognizes that this is a unique view among the Circuits[19] and, undeterred, offers a thorough rebuttal of those other circuits' reasoning. And the majority is, of course, entitled to engage in that exercise. But we are not at liberty to rebut the Supreme Court — we are bound by its decisions.

In *Kansas v. Marsh*, 548 U.S. 163, 165-66 (2006), the Court was asked to consider the constitutionality of a statute that required the imposition of the death penalty "when the sentencing jury determines that aggravating evidence and mitigating evidence are in equipoise" — that is, when the aggravating factors do not "outweigh" the mitigating factors at all, but are in equal balance. In reaching its conclusion — that the scheme is constitutional — the Court explained that it has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Id*. at 175 (quoting *Franklin v. Lynaugh*, 487

---

[19]Five Circuits have rejected this view. *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007); *United States v. Purkey*, 428 F.3d 738, 748 (8th Cir. 2005).

U.S. 164, 179 (1988) (plurality opinion) (citing *Zant v. Stephens*, 462 U.S. 862, 875–76 n. 13 (1983))).[20]

Consequently, I must respectfully dissent from the majority's holding today. I would hold that because the Constitution does not dictate the manner in which death-penalty aggravating and mitigating factors are to be weighed, the district court did not violate the Constitution by instructing the jury in accordance with the language of the statute.

**III.**

In summary, I would conclude that the district court was not obliged to admit evidence or argument concerning Michigan's abolition of the death penalty; nor was it required to instruct the jurors that, in order to impose the death penalty, they must find "beyond a reasonable doubt" that the aggravating factors outweighed the mitigating factors. Therefore, I respectfully dissent from these two portions of the majority's decision. I otherwise concur in the majority's judgment.

---

[20]Indeed, the Constitution would allow "a scheme requiring the State to prove *by a mere preponderance of the evidence* that the aggravators outweigh the mitigators." *Marsh*, 548 U.S. at 187 n.2 (Scalia, J., concurring).